### *COYLE v. SMITH *et al.*

No. 2225.    Opinion Filed February 9, 1911.

(113 Pac. 944.)

1. **CONSTITUTIONAL LAW—Encroachment on Executive—Discretion of Governor.** The action of the Governor in convoking the Legislature at, or adjourning it to, another place than the seat of government "when in his opinion the public safety or welfare, or the safety or health of the members, require it," such convoking or adjournment having been separately concurred in by a two-thirds vote of all the members elected to each branch of the Legislature, is conclusive upon, and not subject to be reviewed by, this court.

2. **STATES—Legislature—Membership.** The legislative body, as convoked and constituted at an extraordinary session, assembling more than 15 days after the date of the regular state election held throughout the state in November, 1910, the House of Representatives being composed of the members elected at said election, and the Senate in part by the members elected at said election: Held, that said body was legally constituted.

3. **STATUTES—"Special Law"—"Local Law"—Locating State Capital.** An act entitled "An act providing for the permanent location of the seat of government and capital of the state of Oklahoma, creating a board of capital commissioners and defining its powers and duties, authorizing the Governor to accept for capital purposes the proceeds of the sale of land, or donations from other sources, and declaring an emergency," is neither a special nor a local law.

4. **SAME—Subjects and Titles.** The title of said act is not repugnant to section 57 of article 5 of the Constitution.

5. **STATUTES—Enactment—Passage—Reading of Bill.** When an enrolled bill has been signed by the Speaker of the House and by the President of the Senate respectively, in the presence of those bodies immediately after the bill has been read publicly at length, and the same has been approved by the Governor and deposited in the office of the Secretary of State, it is not competent to show from the journals of the House that the act so authenticated, approved, and deposited was not read on three different days in each House.

6. **STATES—Admission—Effect of Enabling Act.** Said act is not invalid on account of the provision of the Enabling Act requiring by irrevocable ordinance that the capital of the state shall temporarily be at the city of Guthrie, and not be changed therefrom previous to A. D. 1913, after which time it shall be located

*Appealed to the Supreme Court of the United States.

by the electors of said state at an election to be provided for by the Legislature.

7.    **STATES—Seat of Government—Power of Legislature to Locate.** It is within the power of the Legislature to locate the capital of this state.

Dunn and Kane, JJ.. dissenting.

(Syllabus by the Court.)

Action by W. H. Coyle against Thomas P. Smith and others for an injunction. Petition dismissed.

*John H. Burford, C. G. Hornor, Frank Dale, A. G. C. Bierer, Frank B. Burford,* and *Ben F. Hegler,* for plaintiff.

*C. B. Stuart, B. F. Burwell,* and *W. A. Ledbetter,* for defendants.

WILLIAMS, J.    The following questions are essential for determination:

(1) Was the action of the Governor in convoking the Legislature at Oklahoma City valid?

(2) Was said legislative body as convoked at said extraordinary session legally constituted?

(3) Is a certain act passed at said session, entitled "An act providing for the permanent location of the seat of government and capital of the state of Oklahoma, creating a board of capital commissioners and defining its powers and duties, authorizing the Governor to accept for capital purposes the proceeds of the sale of land or donations from other sources, and declaring an emergency," a special or local law?

(4) Is the title of said act repugnant to section 57 of article 5 of the Constitution?

(5) Is said act void for the reason that it was not read on three different days in each House?

(6) Is said act violative of the provisions of the Enabling Act requiring that the capital of the state "shall temporarily be at the city of Guthrie and not be changed therefrom previous to A. D. 1913, after which time it shall be located by the electors of said state at an election to be provided for by the Legislature," with

the limitation that the Legislature, except as shall be necessary for the convenient transaction of the public business of said state at said capital, shall not appropriate any public moneys of the state for the erection of buildings for capital purposes during such period?

(7) Can the Legislature locate the capital of the state?

1. Section 14 of article 6 of the Constitution of this state provides that the Governor "may convoke the Legislature at, or adjourn it to, another place, when, in his opinion, the public safety or welfare, or the safety or health of the members require it; provided, however, that such change or adjournment shall be concurred in by a two-thirds vote of all the members elected to each branch of the Legislature." The obvious meaning of this provision is that when the Governor convokes the Legislature in session at any place other than the capital, after assembling, each House must separately concur in such convocation by a two-thirds vote of all the members elected to the respective bodies. It is admitted that by a two-thirds vote of all the members elected to each branch of the Legislature such call was separately concurred in, after the Legislature assembled in Oklahoma City. If it was necessary for the Legislature to first meet at Guthrie, the seat of government, and, having concurred in such call, to adjourn to the place at which it was originally convoked, said provision of section 14, *supra,* must be construed to mean that the Governor may convoke the Legislature at another place other than the capital, when, in his opinion, the public safety or welfare, or the safety or health of the members may require it, provided, however, that such change shall be concurred in by a two-thirds vote of all the members elected to each branch of the Legislature, at a meeting held at the capital before assembling at the place to which it was convoked. Such seems not to be the reasonable construction. It was evidently contemplated by the framers of the Constitution that before the Governor would convoke the Legislature at a place other than the seat of government, an emergency would exist involving the public safety or welfare, or the safety or health of the mem-

bers requiring such temporary change in the place of assembling, and if such exigency required them to assemble at another place, it would not be reasonable to suppose it was intended, or be reasonably practicable for, the Legislature to first assemble at the seat of government and concur in such call of the Governor, before they could legally assemble at the place to which they were convoked. Such emergency as was contemplated would, in most instances, render that impossible; for instance, in time of war, insurrection, epidemics, or pestilence, etc.

The reasonable construction is that after they were convoked at such other place, when they assembled, unless two-thirds of all the members elected to each branch of the Legislature separately concurred in such call then such call would be a nullity. It appearing that such call was so concurred in after assembling at the place to which they were convoked, the action of the Governor and the Legislature in the premises is conclusive upon, and not subject to be reviewed by, this court. *Oklahoma City v. Shields,* 22 Okla. 305, 100 Pac. 559; *State ex rel. v. Brown, Judge,* 24 Okla. 433, 103 Pac. 762; *Martin v. Mott,* 12 Wheat. 19, 6 L. Ed. 537; *In re Special Session,* 9 Colo. 642, 21 Pac. 477; *People v. Hatch,* 33 Ill. 9; *Farrelly v. Cole,* 60 Kan. 356, 56 Pac. 492, 44 L. R. A. 464; *Taylor v. Beckham,* 108 Ky. 278, 56 S. W. 177, 49 L. R. A. 258, 94 Am. St. Rep. 357; *People v. Rice,* 65 Hun, 236, 20 N. Y. Supp. 293; *People v. Parker,* 3 Neb. 409, 19 Am. Rep. 634; *Vanderheyden v. Young,* 11 Johns. (N. Y.) 150; *In re Legislature Adjournment,* 18 R. I. 824, 27 Atl. 324, 22 L. R. A. 716; *State v. Fair,* 35 Wash. 127, 76 Pac. 731, 102 Am. St. Rep. 897.

2. Section 9, art. 5, of the Constitution of this state, provides:

"The Senate, except as hereinafter provided, shall consist of not more than forty-four members, whose terms of office shall be four years: Provided, that one senator elected at the first election from each even numbered district shall hold office until the fifteenth day succeeding the regular state election in nineteen hundred and eight, and one elected from each odd-numbered district at said first election, shall hold office until the fifteenth day succeeding the day of the regular state election in nineteen hun-

dred and ten: And provided further, that in districts electing two senators the two elected at the first election shall cast lots in such manner as the Legislature may prescribe to determine which shall hold the long and which the short term."

And section 10 of article 5 of the Constitution provides:

"The House of Representatives, unless otherwise provided by law, shall consist of not more than one hundred and nine members who shall hold office for two years. Provided, that the representatives elected at the first election shall hold office until the fifteenth day succeeding the day of the regular state election in nineteen hundred and eight: And provided, that the day on which state elections shall be held shall be fixed by the Legislature.

"(a) The first Legislature shall meet at the seat of government upon proclamation of the Governor on the day named in said proclamation, which shall not be more than thirty days nor less than fifteen days after the admission of the state into the Union. * * *"

Section 40 of the Schedule of the Constitution is as follows:

"The terms of all officers of the state government elected at the time of the adoption of this Constitution shall begin upon the admission of the state into the Union."

Section 41 of the Schedule also provides:

"All persons elected at the time of the adoption of this Constitution to any of the offices provided under the Constitution shall be deemed to have duly qualified upon their taking the oath of office before any officer authorized by law to administer oaths, and executing such bond as may be required by law."

If no provisos had been inserted in sections 9 and 10, *supra*, it would be clear that it was the intention of the framers of the Constitution that the terms of the members of the House would begin on the date of the admission of the state into the Union, and continue for two years. The ordinance under which the Constitution was submitted to the electors of the proposed state for ratification or rejection, and the first set of state officers, including county and township officers, were elected, at an election held on the 17th day of September in 1907, provided that on Friday following the day on which such election was to be held, to wit, Tuesday, the returns in each county should be canvassed and certified copies or abstracts as to state and district officers, together with the vote as

to the Constitution, be immediately returned to the Secretary of the Territory of Oklahoma, and provided that on the 8th day of October, 1907, or as soon thereafter as practicable, the same should be opened, canvassed, and the result certified and transmitted to the President of the United States, as provided in the Enabling Act (Act June 16, 1906, c. 3335, 34 Stat. 267).

The framers of the Constitution evidently recognized that the terms of the members of the Lower House and of the short-term Senators of the First Legislature would be less than two years. In providing for such terms to expire on the fifteenth day succeeding the day of the regular state election in 1908, it was fixing a date certain, not only on which the terms of such members of that Legislature should expire in said year; but also on which the terms of their successors should begin. This is a reasonable construction producing harmony. Any other construction would bring about an unreasonable condition, or an interregnum between the fifteenth day succeeding the day of the regular state election in 1908, and the 1st day of January, 1909. Interregnums are not favored in law. Section 10 of article 23 of the Constitution was adopted, which provides:

"Except wherein otherwise provided in this Constitution, in no case shall the salary or emoluments of any public official be changed after his election or appointment, or during his term of office, unless by operation of law enacted prior to such election or appointment; nor shall *the term* of any public official *be extended* beyond the period for which he was elected or appointed: Provided, that all officers within this state shall continue to perform the duties of their office until their successors shall be duly qualified."

This section is cited by the plaintiff in support of his contention that the Legislature was not properly constituted. If plaintiff's contention be true, the framers of the Constitution deliberately fixed the date of the termination of the terms of the members of the Lower House and of the short-term Senators of the First Legislature at a certain date, and then, recognizing that section 3355 of Wilson's Rev. & Ann. St. 1903 (section 3110, St. Okla. T. 1893), would be extended in force in the state by virtue

of section 2 of the Schedule to the Constitution, in effect operating to extend such terms from the fifteenth day succeeding the day of the regular state election in November, 1908, to the 1st day of January, 1909, by providing that all officers within this state shall continue to perform the duties of their offices until their successors shall be duly qualified. If that was contemplated, why not provide that such members of the House and short-term Senators should hold to January 1, 1909, and not put the framers in the attitude of reaching such a result by such hotchpotch means. This contention is contrary to the spirit of section 10, art. 23, *supra.* According to plaintiff's contention said section 3355, *supra,* an act of the Legislature of Oklahoma Territory as it was continued in force by section 2 of the Schedule after the erection of the state, had the effect of extending the terms, not only of all the members of the Lower House, but of the short-term Senators of the First Legislature, which was contrary to the spirit of said section.

The proviso that all officers within this state shall continue to perform the duties of their office until their successors shall be duly qualified does not enlarge on what goes before in said section, but is intended to cover exigencies arising from a failure in an election or appointment, or after an election or appointment being had or made the officer fails to qualify, in which event the incumbent of such office should hold until such qualification was made, showing, the abhorrence of the framers of the Constitution of bringing about an interregnum. The terms of the members of the Lower House and of the short-term Senators of the First Legislature having expired on the fifteenth day after the regular state election in November, 1908, their successors having been duly elected in such state election, when they took the oath of office prescribed by section 1 of article 15 of the Constitution, were duly qualified and succeeded to such office, and it was not within the power of the Legislature of the state to extend the original terms of the members of the Lower House and the short-term Senators of the First Legislature, thereby depriving the representatives com-

ing immediately from the powers of sovereignty of sitting within the legislative halls as representatives of the people.

Further, when we consider the fact that the term of the Governor would expire on the second Monday of January, 1911, and every four years thereafter, there would probably be sufficient intervening time between the date on which the regular state election would be held and the expiration of the Governor's term in which a special or extraordinary session of the Legislature could be convened, we are confirmed in the foregoing conclusion. If there should be a revolt by the people in sentiment against the administration of the executive department resulting in the election of a new Legislature and a new Governor, who would inaugurate a policy different from that of the preceding administration, of the terms of the members of the Lower House and one-half of the Senate expired at the same time as the term of the Governor, it might result in the chief executive calling an extraordinary session of the Legislature and the members thereof to enact laws, when members had been more recently elected by the people with a contrary mandate. It is to be apprehended that the preventing of such was in view when these provisions were incorporated in the Constitution. Sections 9 and 10 of article 5, and 40 and 41 of the Schedule to the Constitution, pertain to the same general subject-matter, and accomplish the same general purpose as section 3355, Wilson's Rev. & Ann. St., *supra* (section 3110, St. Okla. T. 1893).

In *Smock v. Farmers' Union State Bank*, 22 Okla. 825, 98 Pac. 945, this court said:

"House Bill No. 615 covers the entire grounds of said chapter 8, Wilson's Rev. & Ann. St. 1903, and of the four subsuquent acts of the legislature above referred to. It pertains to the same general subject-matter, and seeks to accomplish the same general purpose and in the main is a re-enactment of those statutes in the same language, and we are therefore of the opinion that said act was intended by the Legislature as a substitute for all the laws then existing upon the subject-matter

dealt with in that act, and that said former laws were repealed by it."

This rule was again affirmed in *Ripey & Son v. Art Wall Paper Mills*, 27 Okla. 600, 112 Pac. 1119. Under this rule of construction said section 3355 would be repealed by substitution, and therefore was not brought over by section 2 of the Schedule. Both bodies of the Legislature construed these provisions of the Constitution in the organization of their separate bodies and determining their respective memberships. This determination, relating solely to political questions, was by a branch of government co-ordinate to this court. This determination and conclusion reached by the legislative department was also concurred in by the executive department.

It is a recognized rule of construction that if the meaning of a constitutional provision is doubtful, a practical construction thereof by the Legislature will be followed by the courts, if it can be done without doing violence to the fair meaning of the words used in order to sustain the constitutionality of the statute. 8 Cyc. 737, and authorities cited in footnote 82. "Where the questions involved are of a political character, and action depends upon the construction to be given a constitutional provision or statute, courts will not only give great consideration to constructions of such provisions or statutes by the political departments of the government in doubtful cases. * * *" 8 Cyc. 727; *Luther v. Borden,* 7 How. 1, 12 L. Ed. 581; *Griffin's Case,* Chase (U. S.) 364, Fed. Cas. No. 5,815, 2 Am. Law T. Rep. U. S. Cts. 93, 8 Am. Law Reg. (N. S.) 358, 3 Am. Law Rev. 784, 2 Balt. Law Trans. 433, 25 Tex. Supp. 623; *U. S. v. Lytle,* 5 McLean (U. S.) 9, Fed. Cas. No. 15,652.

In *Betts v. Commissioners of the Land Owce,* 27 Okla. 64, 110 Pac. 769, this court said:

"The Commissioners of the Land Office, a branch of the executive department of the state, having construed such rules and regulations as to include the authority to pay the necessary expenses

and cost of such leasing out of the rentals, and the Legislature, after having knowledge of such construction, having failed to make an appropriation therefor, pursuant to section 55 of article 5 of the Constitution, evidently placed a like construction thereon, and the co-ordinate branches of government, to wit, the executive and legislative departments, having so construed said provisions, such concurring construction, though not controlling, is persuasive (*Higgins v. Brown*, 20 Okla. 355, 94 Pac. 703; *Territory v. Long Bell Lbr. Co.*, 22 Okla. 890, 99 Pac. 911; *City Council, etc., v. Board of Commissioners, etc.*, 33 Colo. 1, 77 Pac. 858), * * * "

We do not feel that we would be justified in declaring the Legislature as organized in Oklahoma City to be an illegal body.

3. Section 32 of article 5 of the Constitution provides "that no special or local law shall be considered by the Legislature until notice of the intended introduction of such bill or bills shall first have been published for four consecutive weeks in some weekly newspaper published or of general circulation in the city or county affected by such law, stating in substance the contents thereof, and verified proof of such publication filed with the Secretary of State."

In *Cordova v. State*, 6 Tex. App. 218, it is said:

"An ordinance passed by the Convention of 1875, which framed our present state Constitution, fixes the terms of the holding of the district court in the county of Bexar to the fourth Mondays in April and October, until otherwise provided by law. Article 5, § 7, of the Constitution, reads as follows: 'The state shall be divided into twenty-six judicial districts, which may be increased or diminished by the Legislature. For each district, there shall be elected by the qualified voters thereof, at a general election for members of the Legislature, a judge, who shall be at least twenty-five years of age, shall be a citizen of the United States, shall have been a practicing attorney or a judge of a court of this state for a period of four years, and shall have resided in the district in which he is elected for two years next before his election; * * * and shall hold the regular term of court at one place in each county twice in each year, in such manner as may be prescribed by law. The Legislature shall have power, by general act, to authorize the holding of special terms, when necessary, and to provide for holding more than two terms of the court in any county,

for the dispatch of business.' Article 3, § 57, of the Constitution is as follows: 'No local or special law shall be passed, unless notice of the intention to apply therefor shall have been published in the locality where the matter or thing to be affected may be situated, which notice shall state the contemplated law, and shall be published at least 30 days prior to the introduction into the Legislature of such bill, and in the manner to be provided by law. The evidence of such notice having been published shall be exhibited in the Legislature before such act shall be passed.' The defendant claims that the act of the Legislature which gives five terms of the district court to Bexar county is in contravention of the provisions of the Constitution, and is therefore null and void. All acts of the Legislature must be sustained by the courts, unless they are clearly and undoubtedly repugnant to the Constitution. The judiciary looks to the acts of the Legislature with just respect, and reconciles them with the Constitution, and sustains them, if possible. In expounding a constitutional provision, such construction should be employed as will prevent any clause, sentence, or word from being superfluous, void, or insignificant. The thing to be sought is the thought expressed. Contemporaneous legislative construction is always considered in force. The Constitution, in express terms, having conferred upon the Legislature the power, by general law, to provide for more than two terms of the district court in any county, the Legislature, in passing the act under consideration, has, we believe, kept within its constitutional limits. The act which provides for five terms of the district court of Bexar county is not a 'local' or 'special' law, in the sense in which these terms are used in the Constitution. Said act is on a general subject—the regulation of the courts—which cannot be said to affect the welfare and interest of that district alone."

In *State v. Corson*, 67 N. J. Law, 178, 50 Atl. 780, it is said:

"As to the contention that this act is a local or special law regulating the internal affairs of counties and granting exclusive privileges to individuals: The act is said to regulate the internal affairs of counties, because it applies only to the tide waters of Delaware Bay and Maurice river cove, which lie entirely within the counties of Cape May and Cumberland. But, although the area of application is limited to those counties, it clearly does not regulate their internal affairs, for it deals exclusively with property rights of the state, in which every citizen has an interest. That it

confers exclusive privileges, however, is apparent.  As was said in *State v. Post*, 55 N. J. Law, 264 [26 Atl. 683], the right to plant and cultivate oysters on the lands of the state is a privilege, and inasmuch as the statute excludes from the enjoyment of that right every one except the lessees of the state and their licensees, the privilege is an exclusive one.  But this fact does not deprive the state of power to appropriate all or any part of its lands under water for the encouragement and protection of the planting and cultivation of oysters, and to grant rights therein for that purpose. Its effect is to require such appropriation to be made by general laws, and it prevents the selection of individuals or corporations as the objects of the state's bounty to the exclusion of other citizens of the state.  *State v. Post, supra.*  Is the law, then, a special or local law, and does it exclude any of the citizens of the state from participating in the privileges which it confers?  A statute is not special or local merely because it authorizes or prohibits the doing of a thing in a certain locality.  It is, notwithstanding this fact, a general law, if it applies to all the citizens of the state and deals with a matter of general concern.  *Doughty v. Conover*, 42 N. J. Law, 193.  The application of this principle led this court, in the case cited, to the conclusion that a statutory provision which made it unlawful for any person to net fish during certain periods of the year 'in the waters of Burlington and Atlantic' was not special or local, but general.  Although it deals with the lands of the state under tide water only in certain localities, the matters which it regulated are of general, not local, concern.  The lands themselves belong to the people of the state, not to the citizens of the counties where they are located."

See, also, *Holt v. Mayer & Aldermen of Birmingham*, 111 Ala. 369, 19 South. 735; *City of Pond Creek v. Haskell*, 21 Okla. 711, 97 Pac. 338; *Anderson v. Ritterbusch*, 22 Okla. 761, 98 Pac. 1002.

If said  act be a special act, then every act of the Legislature fixing the salary of the Governor of the state, or the terms of the Supreme Court, or locating or making an appropriation for any particular state institution, would be a special act, and in order to change the salary of the Governor, or fix the terms of the Supreme Court, or locate or make an appropriation for such state institution, it would be necessary to first publish a notice as required by section 32 of article 5, *supra.*  This provision of the Constitu-

tion should receive a reasonable construction. This notice was required to be published where laws applying solely to particular individuals, or to any particular locality, were sought to be passed for the benefit or prejudice of such locality, in order that they might have an opportunity to appear before the Legislature and remonstrate against the passage of such law if they did not think it was wise. But when such law applies to every part of the state, locating the capital for the entire state, the very fact that it locates it at a particular spot does not make it a special law.

4. Plaintiff urges that the title of the act in question, to wit, "An act providing for the permanent location of the seat of government and capital of the state of Oklahoma, creating a board of capital commissioners and defining its powers and duties, authorizing the Governor to accept for capital purposes the proceeds of the sale of land, or donations from other sources, and declaring an emergency," violates section 57 of article 5 of the Constitution, which provides:

"Every act of the Legislature shall embrace but one subject, which shall be expressed in its title, except general appropriation bills, general revenue bills, and the bills adopting a code, digest, or revision of statutes; and no law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title, but only so much thereof as is revived, amended, extended, or conferred, shall be re-enacted and published at length: Provided, that if any subject be embraced in any act contrary to the provisions of this section, such act shall be void only as to so much of the law as may not be expressed in the title thereof."

In *State v Street et al.,* 117 Ala. 203, 23 South. 807, in an opinion by the late Chief Justice Brickell, it was said:

" * * * We could not hesitate to affirm that the act is free from all just objection as wanting in clearness in the expression of its subject in the title, or of duplicity in the expression of two dissimilar subjects, not having logical and legal connection. It is difficult to conceive of any two matters so treated by common law, and by legislation, and in popular understanding, as constituting but one general subject, as public roads and bridges."

This case was cited with approval by this court in *Rea, County*

*Clerk, v. Board of County Commissioners, Lincoln County, et al.* (decided at its September, A. D. 1910, term, but not yet officially reported).[1] The title of this act relates to the permanent location of the seat of government—or capital of the state; the other parts thereof providing for a board of capital commissioners, to the end that a capitol, or a building for the state officers, may be erected thereon, are cognate to the main subject. Certainly if bridges are cognate to the subject of roads, as the bridge when attached to the soil becomes a fixture and a part of the realty, so will the capitol, or building for the housing of the state officers, when placed upon the grounds where the capital is located, become a part of the same as a fixture. See, also, *State ex rel. v. Hooker, Judge,* 22 Okla. 712, 98 Pac. 964.

5. It is insisted that the bill was not read upon its passage on three different days in each House, as required by section 34 of article 5 of the Constitution, and for that reason this court should declare the same invalid, although the presiding officer of each House has signed said bill, and the same has been duly approved by the Governor and filed with the Secretary of State. This question has been settled against the contention of plaintiff in *Atchison, Topeka & Santa Fe Ry. Co. v. State, ante,* 113 Pac. 921. Paragraph 1 of the syllabus is as follows:

"When an enrolled bill has been signed by the Speaker of the House and by the President of the Senate, respectively, in the presence of those bodies immediately after the bill has been read publicly at length, and the same has been approved by the Governor and deposited in the office of the Secretary of State, it is not competent to show from the journals of the House that the act so authenticated, approved, and deposited did not pass in the form in which it was signed by the presiding officers and approved by the Governor."

There is no contention that the bill was not signed by the Speaker of the House and the presiding officers of the Senate, respectively, in the presence of said bodies immediately after the

---

1 Rehearing Pending.

same had been read publicly at length, or that the same had not been approved by the Governor and deposited in the office of the Secretary of State. This being so, it is not competent to show from the journals of the House that the act so authenticated had not been read on three different days in each House.

6. The Enabling Act of Alabama (March 2, 1819, c. 47, 3 Stat. 491, § 6, par. 4) in part provides:

"That the said convention shall provide, by an ordinance irrevocable without the consent of the United States, that the people inhabiting the said territory, do agree, and declare    *    *    *; and that all navigable waters within the said state shall forever remain the public highways, free to the citizens of said state and of the United States, without any tax, duty, impost, or toll therefor, imposed by the said state."

In *Pollard et al. v. Hagan et al.,* 3 How. 212, 11 L. Ed. 565 (decided in 1845), Mr. Justice McKinley, in delivering the opinion of the court, said:

"The contract made between the United States and the state of Georgia was sanctioned by the Constitution of the United States, by the third section of the fourth article of which it is declared that 'new states may be admitted by the Congress into this Union; but no new state shall be formed or erected within the jurisdiction of any other state, nor any state be formed by the junction of two or more states or parts of states, without the consent of the Legislature of the states concerned, as well as of Congress.' When Alabama was admitted into the Union, on an equal footing with the original states, she succeeded to all the rights of sovereignty, jurisdiction, and eminent domain which Georgia possessed at the date of the cession, except so far as this right was diminished by the public lands remaining in the possession and under the control of the United States, for the temporary purposes provided for in the deed of cession, and the legislative acts connected with it. Nothing remained to the United States, according to the terms in the agreement, but the public lands. And, if an express stipulation had been inserted in the agreement, granting the municipal right of sovereignty and eminent domain to the United States, such stipulation would have been void and inoperative, because the United States have no constitutional capacity to exercise municipal jurisdiction, sovereignty and eminent domain, within the limits of a state

or elsewhere, except in the cases in which it is expressly granted. *
* * Alabama is therefore entitled to the sovereignty and jurisdiction
over all the territory within her limits, subject to the common
law, to the same extent that Georgia possessed it before she ceded
to the United States. To maintain any other doctrine, is to deny
that Alabama has been admitted into the Union on an equal foot-
ing with the original states, the Constitution, laws, and compact
to the contrary notwithstanding. But her rights of sovereignty
and jurisdiction are not governed by the common law of England
as it prevailed in the colonies before the Revolution, but as modified
by our Constitutions. In the case of *Martin et al. v. Waddell* (16
Pet. 410 [10 L. Ed. 997]), the present Chief Justice, in delivering
the opinion of the court, said: 'When the Revolution took place
the people of each state became themselves sovereign; and in that
character hold the absolute right to all navigable waters, and the
soils under them for their own common use, subject only to the
rights since surrendered by the Constitution.' Then to Alabama
belong the navigable waters, and soils under them, in controversy
in this case, subject to the rights surrendered by the Constitution
to the United States; and no compact that might be made be-
tween her and the United States could diminish or enlarge these
rights."

*Permoli v. Municipality of New Orleans,* 3 How. 590, 11 L.
Ed. 739 (decided in 1845), follows and approves the principles
announced in the foregoing case.

Section 5 of the Enabling Act for Ohio (Act April 30,
1802, c. 40, 2 Stat. 174), provided that the proposed Constitution
should be republican and not repugnant to the ordinance of the
13th of July 1787, 1 Stat. 52, note (1 U. S. Comp. St. 1901, p.
lvii) between the original states and the people and the states of
the territory northwest of the Ohio river.

In *Strader et al. v. Graham,* 10 How. 82, 13 L. Ed. 337 (de-
cided in 1850), Mr. Chief Justice Taney, in delivering the opinion
of the court, said:

"But it seems to be supposed in the argument that the law
of Ohio upon this subject has some peculiar force by virtue of
the Ordinance of 1787, for the government of the northwestern
territory, Ohio being one of the states carved out of it. One of
the articles of this Ordinance provides that 'there shall be neither

slavery nor involuntary servitude in the said territory, otherwise than in punishment for crimes whereof the party shall have been duly convicted: Provided always, that any person escaping into the same, from whom labor or service is lawfully claimed in any of the original states, such fugitives may be lawfully reclaimed and conveyed to the person claiming his or her labor or service as aforesaid.' And this article is one of the six which the Ordinance declares shall be a compact between the original states and the said territory, and forever remain unalterable unless by common consent. The article assumes that the six articles which that Ordinance declares to be perpetual are still in force in a state since formed within the territory, and admitted into the Union. If this proposition could be maintained, it would not alter the question. For the regulations of Congress, under the old Confederation or the present Constitution; for the government of a particular territory, could have no force beyond its limits. It certainly could not restrict the power of the states within their respective territories; nor in any manner interfere with their laws and institutions; nor give this court any control over them. The Ordinance in question, if still in force, could have no more operation than the laws of Ohio in the state of Kentucky, and could not influence the decisions upon the rights of the master or the slaves of that state, nor give this court jurisdiction upon the subject. But it has been settled by judicial decision in this court that this Ordinance is not in force. The case of *Permoli v. First Municipality*, 3 How. 589 [11 L. Ed. 739], depended upon the same principles with the case before us. It is true that the question in that case arose in Louisiana. But the act of Congress of April 7, 1798, c. 28, 1 Stat. 549, extended the Ordinance of 1787 to the then territory of Mississippi. with the exception of the anti-slavery clause; and declared that the people of that territory should be entitled to and enjoy all the rights, privileges, and advantages granted to the people of the territory northwest of the Ohio. And by the act of March 2, 1805, c. 23, 2 Stat. 322, it was enacted that the inhabitants of the then territory of Orleans should be entitled to and enjoy all the rights, privileges, and advantages secured by the ordinance of 1787, and at that time enjoyed by the people of the Mississippi Territory.

"In the case above mentioned, Permoli claimed the protection of the clause in one of the six articles which provides for the freedom of religion, alleging that it had been violated by the First

Municipality. And he brought the question before this court, upon the ground that it had jurisdiction under the Ordinance. But the court held that the Ordinance ceased to be in force when Louisiana became a state, and dismissed the case for want of jurisdiction. This opinion is, indeed, confined to the territory in which the case arose. But it is evident that the Ordinance cannot be in force in the states formed in the northwestern territory, and at the same time not in force in the states formed in the southwestern territory, to which it was extended by the present government. For the Ordinance and pledges of the Congress of the old Confederation cannot be more enduring and obligatory than those of the new government; nor can there be any reason for giving a different interpretation to the same words used in similar instruments, because the one is by the old Confederation and the other by the present government. And when it is decided that this Ordinance is not in force in Louisiana, it follows that it cannot be in force in Ohio. But the whole question upon the Ordinance of 1787, and the acts of Congress extending it to other territory afterwards acquired, was carefully considered in *Pollard v. Hagan*, 3 How. 212 [11 L. Ed. 565]. The subject is fully examined in the opinion pronounced in that case, with which we concur; and it is sufficient now to refer to the reasoning and principles by which that judgment is maintained, without entering again upon a full examination of the question.

"Indeed, it is impossible to look at the six articles which are supposed, in the argument, to be still in force, without seeing at once that many of the provisions contained in them are inconsistent with the present Constitution. And if they could be regarded as yet in operation in the states formed within the limits of the northwestern territory, it would place them in an inferior condition as compared with the other states, and subject their domestic institutions and municipal regulations to the constant supervision and control of this court. The Constitution was, in the language of the Ordinance, 'adopted by common consent,' and the people of the territories must necessarily be regarded as parties to it, and bound by it, and entitled to its benefits, as well as the people of the then existing states. It became the supreme law throughout the United States. And so far as any obligations of good faith had been previously incurred by the Ordinance, they were faithfully carried into execution by the power and authority of the new government. In fact, when the Constitution was adopted, the

settlement of that vast territory was hardly begun; and the people who filled it, and formed the great and populous states that now cover it, became inhabitants of the territory after the Constitution was adopted, and migrated upon the faith that its protection and benefits would be extended to them, and that they would in due time, according to its provisions and spirit, be admitted into the Union upon an equal footing with the old states. For the new government secured to them all the public rights of navigation and commerce which the Ordinance did or could provide for; and, moreover, extended to them when they should become states much greater power over their municipal regulations and domestic concerns than the Confederation had agreed to concede. The six articles, said to be perpetual as a compact, are not made a part of the new Constitution, and cannot confer power and jurisdiction upon this court. The whole judicial authority of the courts of United States is derived from the Constitution itself, and the laws made under it.

"It is undoubtedly true that most of the material provisions and principles of these six articles, not inconsistent with the Constitution of the United States, have been the established law within this territory ever since the Ordinance was passed; and hence the Ordinance itself is sometimes spoken of as still in force. But these provisions owed their legal validity and force, after the Constitution was adopted and while the territorial government continued, to the act of Congress of August 7, 1789 [c. 8, 1 Stat. 50], which adopted and continued the Ordinance of 1787, and carried its provisions into execution, with some modifications, which were necessary to adopt its form of government to the new Constitution. And in the states since formed in the territory, these provisions, so far as they have been preserved, owe their validity and authority to the Constitution of the United States, and the Constitutions and laws of the respective states, and not to the authority of the Ordinance of the old Confederation. As we have already said, it ceased to be in force upon the adoption of the Constitution, and cannot now be the source of jurisdiction of any description in this court."

The Enabling Act for Mississippi (March 1, 1817, c. 23, 3 Stat. 348), provided that the Constitution when formed should not be repugnant to the principles of the Ordinance of the 13th of July, 1787, between the people and states of the territory northwest

of the Ohio river, so far as the same had been extended to the said territory by the articles of agreement between the United States and the state of Georgia, or of the Constitution of the United States, and also that the said convention should provide by an ordinance irrevocable that the people inhabiting said territory do agree and declare that the river Mississippi, and the navigable waters and rivers leading into the same, or into the Gulf of Mexico, shall be common highways, and forever free, as well to the inhabitants of the said state as to other citizens of the United States, without any tax, duty, impost, or toll therefor, imposed by the said state. The act admitting said state into the Union (December 10, 1817, 3 Stat. 472), declared that the people of the said territory did, on the 15th day of August in that year, by convention, frame for themselves a Constitution and state government in conformity to the principles of the articles of compact between the original states and the people and states in the territory northwest of the river Ohio, etc., and that the state of Mississippi is declared to be one of the United States of America, and admitted into the Union on an equal footing with the original states, in all respects whatever.

In *Withers v. Buckley*, 20 How. 84, 15 L. Ed. 820, decided by an unanimous opinion, it is said:

"In considering this act of Congress of March 1, 1817, it is unnecessary to institute any examination or criticism as to its legitimate meaning, or operation, or binding authority, farther than to affirm that it could have no effect to restrict the new state in any of its necessary attributes as an independent sovereign government, not to inhibit or diminish its perfect equality with the other members of the confederacy with which it was to be associated. These conclusions follow from the very nature and objects of the confederacy, from the language of the Constitution adopted by the states, and from the rule of interpretation pronounced by this court in the case of *Pollard's Lessee v. Hagan*, 3 How. 223 [11 L. Ed. 565]."

The Enabling Act of Illinois (April 18, 1818, c. 67, 3 Stat. 428), provided that the Constitution should not be repugnant to the Ordinance of the 13th of July, 1787, between the original

states and the people and the states of the territorw northwest of the Ohio river, except so much of said articles as related to the boundaries of the states therein to be formed. The resolution of Congress admitting the state (December 3, 1818) declared that the Constitution and state government so formed, being in conformity to the principles of the articles of the compact between the original states and the people and states in the territory northwest of the Ohio river, passed by the people in said territory on the 13th of July, 1787, the state of Illinois is declared to be admitted into the Union on an equal footing with the original states in all respects whatever.

Speaking of the Ordinance of 1787, in *Escanaba, etc., Co. v. City of Chicago*, 107 U. S. 678-691, 2 Sup. Ct. 193 (27 L. Ed. 442), the court said:

" * * * Although the act of April 18, 1818 (enabling the people of Illinois Territory, to form a Constitution and state government, and the act of August 26th following, admitting the state into the Union), refer to the principles of the ordinance according to which the Constitution was to be formed, its provisions could not control the authority and powers of the state after her admission. Whatever the limitation upon her powers as a government, whilst in a territorial condition, whether from the Ordinance of 1787, or the legislation of Congress, it ceased to have any operative force except as voluntarily adopted by her after she became a state of the Union. On her admission she at once became entitled to and possessed all the rights of dominion and sovereignty which belonged to the original states. She was admitted and could be admitted only on the same footing with them."

In *Huse v. Glover* (C. C.) 11 Biss. 550, 15 Fed. 292, Mr. Justice Harlan, sitting on the circuit, said:

"Nor do we perceive that the power of the state in this respect is in any degree affected by the Ordinance of 1787, even if that ordinance as to the matters now under consideration be not superseded by the Constitution of the United States. Illinois entered the Union upon terms of equality in all respects with the states which existed at the time the Constitution was formed. In the statute of Virginia, authorizing the cession to the United States of the territory northwest of the Ohio river, and in the deed

of cession, one of the conditions prescribed was that the states formed out of that territory should be admitted 'members of the federal Union, having the same rights of sovereignty, freedom, and independence as the other states.' The ordinance itself provided for the admission of the new states 'on an equal footing with the original states, in all respects whatever.' So that, it seems to the court Illinois has as full power and jurisdiction over her navigable streams as Virginia has over the navigable streams within her limits.   *   *   * "

This opinion was approved by the Supreme Court of the United States in *Huse v. Glover*, 119 U. S. 543, 7 Sup. Ct. 313, 30 L. Ed. 487, in an opinion by Mr. Justice Field, wherein it is said:

"The opinion of that court presents in a clear and satisfactory manner the full answer to them, and nothing can be added to the force of its reasoning. In affirming its conclusions we can do little more than repeat its argument. *Huse v. Glover* (C. C.) 11 Biss. 550 [15 Fed. 292]. The fourth section of the ordinance for the government of the northwestern territory was the subject of consideration in *Escanaba, etc., Trans. Co. v. Chicago*, 107 U. S. 678 [2 Sup. Ct. 185, 27 L. Ed. 442]. We there said that the ordinance was passed before the Constitution took effect; that although it appears by various acts of Congress to have been afterwards treated as in force in the territory, except as modified by them, and the act enabling the people of Illinois Territory to form a Constitution and state government, and the resolution of Congress admitting the state in to the Union, referred to the principles of the ordinance, according to which the Constitution was to be formed, its provisions could not control the powers and authority of the state after her admission; and whatever the limitation of her powers as a government whilst in a territorial condition, whether from the Ordinance of 1787 or the legislation of Congress, it ceased to have any operative force, except as voluntarily adopted by her, after she became a state of the Union; that on her admission she at once became entitled to and possessed of all the rights of dominion and sovereignty which belonged to the original states; that the language of the resolution admitting her was that she is 'admitted into the Union on an equal footing with the original states in all respects whatever'; and that she could, therefore, afterwards exercise the same powers over rivers within her limits

as Delaware exercised over Blackbird creek, and Pennsylvania over Schuylkill river."

In this opinion the cases of *Pollard v. Hagan, Permoli v. Municipality of New Orleans,* and *Strader v. Graham, supra,* are cited with approval.

In *Cardwell v. American River Bridge Co.,* 113 U. S. 205, 5 Sup. Ct. 423, 28 L. Ed. 959, wherein the Enabling Act for California (September 9, 1850) was construed, the cases of *Pollard v. Hagan, Permoli v. Municipality, etc., Strader v. Graham,* and *Escanaba, etc., v. City of Chicago, supra,* as to the foregoing principles, are cited with approval.

In *Sands v. Manistee River Improvement Co.,* 123 U. S. 288, 8 Sup. Ct. 113, 31 L. Ed. 149, in an opinion by Mr. Justice Field, it is said:

"The Ordinance of 1787 was passed a year and some months before the Constitution of the United States went into operation. Its framers, and the Congress of the Confederation which passed it, evidently considered that the principles and declaration of rights and privileges expressed in its articles would always be of binding obligation upon the people of the territory. The Ordinance in terms ordains and declares that the articles 'shall be considered as articles of compact between the original states and people and states in the said territory, and forever remain unalterable unless by common consent.' And for many years after the adoption of the Constitution, its provisions were treated by various acts of Congress as in force, except as modified by such acts. In some of the acts organizing portions of the territory under separate territorial governments it is declared that the rights and privileges granted by the Ordinance are secured to the inhabitants of those territories. Yet, from the very condition on which the states formed out of that territory were admitted into the Union, the provisions of the Ordinance became inoperative except as adopted by them. All the states thus formed were, in the language of the resolutions or acts of Congress, 'admitted into the Union on an equal footing with the original states, in all respects whatever.' Michigan, on her admission, became, therefore, entitled to and possessed of all the rights of sovereignty and dominion which belonged to the original states, and could at any time afterwards exercise full control over the

navigable waters except as restrained by the Constitution of the United States and laws of Congress passed in pursuance thereof."

And again the Permoli, Pollard, Escanaba, and Huse Cases are cited with approval.

In *Williamette Iron Bridge Co. v. Hatch* (C. C.) 19 Fed. 352, Judge Deady said:

"Although the grant of power to Congress to admit new states into this Union (U. S. Const. art. 4, § 3), is unqualified, yet it is well established by the Supreme Court that Congress cannot admit a state upon any other than an equal footing with the other states therein, and therefore cannot as a consideration of such admission, make any valid compact or enactment which shall deny to such state within its limits the municipal powers common to the others. *Pollard v. Hagan,* 3 How. 233 [11 L. Ed. 565]; *Permoli v. New Orleans,* 3 How. 589 [11 L. Ed. 739]; *Strader v. Graham,* 10 How. 92 [13 L. Ed. 337]. The act of 1859 admitting Oregon into the Union contains ([Act Feb. 14, 1859, c. 33, 11 Stat. 383] section 4) four propositions to the people of Oregon concerning the public lands therein, which, in consideration of a valuable grant of public land, they accepted by an act of Legislature of June 3, 1859. Deady & Lane's Gen. Laws Or., p. 101.  *  *  *  By the first one, as we have seen, it was simply held that Congress cannot, by any compact or condition made with or laid upon the state on her admission into the Union, restrain or limit her municipal power as such state, but that, if the subject of the compact or condition is within the power of Congress to enact or regulate, without the consent of the state, as to declare that the navigable waters therein shall be 'common highways,' it is good as in law."

Circuit Judge Sawyer concurred with Judge Deady in the foregoing opinion.

In *Williamette Iron Bridge Company v. Hatch,* 125 U. S. 1, 8 Sup. Ct. 811, 31 L. Ed. 629, in an opinion by Mr. Justice Bradley, this case is reviewed, wherein it is said:

"This clause in question had its origin in the fourth article of the compact contained in the Ordinance of the Old Congress for the government of the territory northwest of the Ohio, adopted July 13, 1787, in which it was amongst other things declared that 'The navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common high-

ways and forever free, as well to the inhabitants of said territory as to the citizens of the United States, and those of any other states that may be admitted into the Confederacy without·any tax, impost, or duty therefor.' 1 Stat. 52. This court has held that when any new state was admitted into the Union from the northwest territory the Ordinance in question ceased to have any operative force in limiting its powers of legislation as compared with those possessed by the original states. On the admission of any such new state, it at once becomes entitled to and possessed of all the rights of dominion and sovereignty which belonged to them. See the cases of *Pollard v. Hagan, supra; Permoli v. First Municipality of N. O.,* 3 How. 489 (11 L. Ed. 739); *Escanaba Co. v. Chicago; Cardwell v. American Bridge Co.; Huse v. Glover. qua supra.* In admitting some of the new states, however, the clause in question has been inserted in the law, as it was in the case of Oregon, whether the state was carved out of the territory north-west of the Ohio, or not; and it has been supposed that, in this new form of enactment, it might be regarded as a regulation of commerce, which Congress has the right to impose. *Pollard v. Hagan,* 3 How. 212, 230 (11 L Ed. 565, 574)."

See, also, *State of Pennsylvania v. Wheeling, etc., Bridge Co. et al.,* 13 How. 518, 14 L. Ed. 269.

In *Dred Scott v. Sandford,* 19 How. 393, 15 L. Ed. 718, in an opinion by Chief Justice Taney, it is said:

"There is certainly no power given by the Constitution to the federal government to establish or maintain colonies bordering on the United States or at a distance, to be ruled and governed at its own pleasure; nor to enlarge its territorial limits in any way, except by the admission of new states. That power is plainly given; and if a new state is admitted it needs no further legislation by Congress, because the Constitution itself defines the relative rights and powers and duties of the state, and the citizens of the state and the federal government. But no power is given to acquire a territory to be held and governed permanently in that character."

In the same case, in a separate opinion concurring, Mr. Justice Campbell said:

"This claim to impose a restriction upon the people of Missouri involved a denial of the constitutional relations between the

people of the states, and Congress, and affirmed a concurrent right for the latter, with their people to constitute the social and political system of the new states. A successful maintenance of this claim would have altered the basis of the Constitution. The new states would have become members of a Union defined in part by the Constitution and in part by Congress. They would not have been admitted to this 'Union.' Their sovereignty would have been restricted by Congress as well as the Constitution. The demand was unconstitutional and subversive, but was prosecuted with an energy and aroused such animosities among the people, that patriots, whose confidence had not failed during the Revolution, began to despair for the Constitution."

In *Ward v. Race Horse,* 163 U. S. 504, 16 L. Ed. 1076, 41 L. Ed. 247, in an opinion by Mr. Justice White, it is said:

"The act which admitted Wyoming into the Union, as we have said, expressly declared that that state should have all the powers of the other states of the Union, and made no reservation whatever in favor of the Indians. These provisions alone considered would be in conflict with the treaty if it was so construed as to allow the Indians to seek out every unoccupied piece of government land and thereon disregard and violate the state law, passed in the undoubted exercise of its municipal authority. But the language of the act admitting Wyoming into the Union, which recognized her coequal rights, was merely declaratory of the general rule."

—Then follows citation of the cases of *Pollard v. Hagan,* 3 How. 212, 11 L. Ed. 565; *Permoli v. Municipality, etc.,* 3 How. 589, 11 L. Ed. 739; *Withers v. Buckley,* 20 How. 84, 15 L. Ed. 820; *Escanaba Co. v. Chicago,* 107 U. S. 678, 2 Sup. Ct. 185, 27 L. Ed. 442; *Williamette Iron Bridge Co. v. Hatch,* 125 U. S. 1, 8 Sup. Ct. 811, 31 L. Ed. 629, with approval.

In *Bolin v. State of Nebraska,* 176 U. S. 83, 20 Sup. Ct. 287, 44 L. Ed. 383, in an opinion by Mr. Justice Brown, it is said:

"The argument of the plaintiff in error in this connection is that by these acts the people of Nebraska adopted the Constitution of the United States, and thereby the first eight amendments containing the Bill of Rights became incorporated in the Constitution of the state, and that the right to proceed for felonies, other than by an indictment of a grand jury (as required by the fifth amend-

ment), was taken away from such state.  *  *  *  But this court has held in many cases that, whatever be the limitations upon the power of a territorial government, they cease to have any operative force, except as voluntarily adopted after such territory has become a state of the Union. Upon the admission of a state it becomes entitled to and possesses all the rights of dominion and sovereignty which belonged to the original states, and, in the language of the act of 1867 admitting the state of Nebraska [Act Feb. 9, 1867, c. 36, 14 Stat. 391], it stands 'upon an euqal footing with the original states in all respects whatsoever.'  *  *  * Not only did Congress in the act of 1867 declare that Nebraska was admitted on an equal footing with the original states, but the whole federal system is based upon the fundamental principle of the equality of the states under the Constitution. The idea that one state is debarred, while the others are granted, the privilege of amending their organic laws to conform to the wishes of their inhabitants is so repugnant to the theory of their equality under the Constitution that it cannot be entertained even if Congress had power to make such discrimination. We are therefore of the opinion that the provision of the Constitution of Nebraska, permitting prosecutions for felony by information, does not conflict with the fourteenth amendment to the Constitution of the United States."

It being within the discretion of Congress to determine when a new state shall be admitted into the Union, it has the arbitrary power, as preliminary to such admission, to require a state to insert a certain provision in its Constitution, or to enact such provision as a law by ordinance, but it is not within the power of Congress to require that such be done so as to be irrevocable on the part of the state without the consent of Congress, when it relates to the local municipal or police concern of the state, and is not embraced within any of the delegated powers of the national government. Louisiana, Ohio, Indiana, Illinois, Michigan, and Wisconsin could have adopted the provisions of the Ordinance of 1787 as a part of their respective Constitutions, or under certain conditions have enacted said provisions into laws by ordinance, and the same would then have been in force in such state, except where it was repugnant to some power delegated to

the federal government. Such seems to have been the intimation in the following cases:

In *Permoli v. Municipality of New Orleans, supra:*

"* * * The laws of Congress were all superseded by the state Constitution; nor is any part of them in force unless they are adopted by the Constitution of Louisiana as laws of the state. * * *"

In *Huse v. Glover,* 119 U. S. 543, 7 Sup. Ct. 313, 30 L. Ed. 487, *supra:*

"* * * Whatever the limitations of a power as a government whilst in a territorial condition, whether from the Ordinance of 1787, or the legislation of Congress, it ceased to have operative force, except as adopted by her after she became a state of the Union."

In *Sands v. Manistee River Improvement Company, supra:*

"The provisions of the Ordinance became inoperative except as adopted by them (states)."

In *Strator v. Graham, supra:*

"And in the states since formed in the territory, these provisions, so far as they have been preserved, owe their validity and authority to the Constitution of the United States and the Constitutions and laws of the respective states, and not to the authority of the Ordinance of the Old Confederation."

In *Boyd v. Nebraska,* 143 U. S. 135, 12 Sup. Ct. 375, 36 L. Ed. 103, in an opinion delivered by Mr. Chief Justice Fuller, it was said:

"It follows from these documents that Congress regarded as citizens of the territory all who were already citizens of the United States, and all who had declared their intention to become such. Indeed, they are referred to in section 3 of the Enabling Act as citizens, and by the organic law the right of suffrage and of holding office had been allowed to them. Those whose naturalization was incomplete were treated as in the same category as those who were already citizens of the United States. What the state had power to do after its admission is not the question. Before Congress let go its hold upon the territory, it was for Congress to say who were members of the political community. So far as the original states were concerned, all those who were citizens of such

states became upon the formation of the Union citizens of the United States, and upon the admission of Nebraska into the Union 'upon an equal footing with the original states, in all respects whatsoever,' the citizens of what had been the territory became citizens of the United States and of the state."

Congress was expressly authorized by section 8 of article 1 of the federal Constitution to provide for naturalization of foreign subjects, or aliens permanently residing in the United States.

The Enabling Act of Indiana (Act April 19, 1816, c. 57, 3 Stat. 289), provided that the proposed Constitution should not be repugnant to those articles of the ordinance of the 13th day of July, 1787, which are declared to be irrevocable between the original states and the people and states of the territory northwest of the Ohio river; excepting so much of said articles as relates to the boundaries of the states therein to be formed.

The Ordinance accepting the Enabling Act reads in part as follows:

"That we do, for ourselves and our posterity, agree, determine, declare and ordain, that we will, and do hereby accept the propositions of the Congress of the United States, as made and contained in their act of the nineteenth day of April, eighteen hundred and sixteen, entitled 'An act to enable the people of the Indiana Territory to form a state government, and Constitution, and for the admission of such state into the Union, on an equal footing with the original states;' * * * and we do, moreover, for ourselves and our posterity hereby declare and ordain, that this ordinance and every part thereof, shall forever be and remain irrevocable and inviolate, without the consent of the United States, in Congress assembled, first had and obtained for the alteration thereof, or any part thereof."

In *Depew v. Board of Trustees of the Wabash and Erie Canal,* 5 Ind. 8, it is said:

"On the 13th day of July, 1787, prior to the adoption of the Constitution of the United States, the celebrated ordinance for the government of the territory northwest of the Ohio river was passed, containing, among a great many other stipulations, one providing that the navigable waters, etc., should be free, etc. Afterwards, in September, 1787, was framed the Constitution of the United

States, which was subsequently ratified by the states, and which, as the states of the northwest entered into the confederacy under it, formed a new compact of government for them, and being later than the ordinance superseded it, so far, at least, as to abrogate all restraint upon the powers of the states formed out of said northwestern territory, not existing upon the powers of the original states; and so we understand the Supreme Court of the United States, in *Pollard's Lessee v. Hagan,* 3 How. 212 [11 L. Ed. 565], to have unanimously decided. In other words the states of this confederacy are equal under the Constitution. Everything that one has power to do, each has power to do, so far as restraint from prior compact, or the general government, is concerned."

In *Williams v. Hert* (C. C.) 110 Fed. 166, Baker, District Judge, said:

"It is contended by counsel for the petitioner that by the foregoing ordinances and provisions the right of the people of the state of Indiana to trial by jury on an indictment by a grand jury in the case of all felonies is made an irrevocable and inviolate guaranty of their liberties. Hence it is insisted that the Constitution and laws of this state authorizing the trial of felonies by the court on an information are invalid, because the Congress has never released the state from the obligations of the foregoing acts and ordinances. It is impossible, however, to maintain that the United States holds in trust for the people of the state of Indiana all the great elemental principles of liberty contained in the Ordinance and secured by it to the people of the Indiana Territory, during its existence. The people of the state are sovereign, except in so far as their sovereignty has been surrendered to the national government. This state has never surrendered to the general government its powers to provide for the peace and security of the people and to define and punish criminal offenses committed in violation of its laws. It was admitted into the Union 'on an equal footing with the original states in all respects whatever.' The Ordinance of 1787 and the other acts above quoted have ceased to operate as limitations on the powers of the state. This state possesses all the sovereign powers possessed by any one of the original states of the Union in all respects whatever. This is affirmed in many cases by the Supreme Court. *Pollard v. Hagan,* 3 How. 212, 11 L. Ed. 565; *Permoli v. First Municipality of New Orleans,* 3 How. 589, 11 L. Ed. 739; *Strader v. Graham,* 10 How. 82, 13 L. Ed. 337;

*Escanaba & L. M. Transp. Co. v. City of Chicago,* 107 U. S. 678;
2 Sup. Ct. 185, 27 L. Ed. 442; *Huse v. Glover,* 119 U. S. 543,
7 Sup. Ct. 313, 30 L. Ed. 487; *Bridge Co. v. Hatch,* 125 U. S. 1,
8 Sup. Ct. 811, 31 L. Ed. 629; *Bolln v. State,* 176 U. S. 83, 20
Sup. Ct. 287, 44 L. Ed. 382."

In *Hinman et al. v. Warren et al.,* 6 Or. 409, it is said:

"But it is contended that this sovereignty did not attach
until the state was admitted into the Union. This is true, but
it is also equally true that the United States government has no
constitutional or statutory authority to so act towards a territory,
or so dispose of the lands within a territory, as to make it im-
possible to admit such territory upon an equal footing with the
other states of the Union. In all matters which touch the sover-
eignty, the general government is, in the very nature of our system,
simply a protector thereof until the territory assumes the ample
powers of a state, and becomes thereby enabled to assert and pro-
tect its own sovereignty. *Pollard's Lessees v. Hagan, supra.*"

In *Case v. Toftus* (C. C.) 39 Fed. 730, 5 L. R. A. 684, Judge
Deady said:

"In *Hinman v. Warren,* 6 Or. 408, the court went further, and
held that the United States cannot dispose of the tide lands, even
in a territory. This decision is also based on the dogma of state
sovereignty; that is, the sovereignty of a state *in futuro,* which is
yet, so to speak, *in utero,* or the womb of time, and may never be
born. The proposition is supported by the assertion 'that the United
States government has no constitutional or statutory authority to
so act towards a territory, or so dispose of the lands within a
territory, as to make it impossible to admit such territory upon
an equal footing with the other states of the Union.' In Gould
on Waters, § 40, it is said that this is the only adjudication upon
the subject of the power of the national government, 'while hold-
ing the title to the soil of the tide waters,' to make a valid con
veyance of the same. The author adds: 'The decisions of the
Supreme Court of the United States have been thought to lead to
the conclusion reached in *Hinman v. Warren,* but it would seem
that there is no very direct expression of such a view in the opin-
ions of that court.' The doctrine that new states must be admitted
into the Union on an 'equal footing' with the old ones does not
rest on any express provision of the Constitution, which simply
declares (article 4, § 3): 'New states may be admitted by Con-

gress into this Union,' but on what is considered and has been held by the Supreme Court to be the general character and purpose of the union of the states, as established by the Constitution —a union of political equals. *Pollard v. Hagan,* 3 How. 233 (11 L. Ed. 575); *Permoli v. Municipality No. 1 of New Orleans,* 3 How. 609 (11 L. Ed. 748); *Strader v. Graham,* 10 How. 92 (13 L. Ed. 341.)"

Supported in *Goodtitle v. Kibbe,* 9 How. 477, 13 L. Ed. 220; *Doe v. Beebe et al.,* 13 How. 25, 14 L. Ed. 35; *Gilman v. Philadelphia,* 3 Wall. 726, 18 L. Ed. 96; *Mumford v. Wardwell,* 6 Wall. 436, 18 L. Ed. 756; *Weber v. Harbor Commissioners,* 18 Wall. 66, 21 L. Ed. 798; *County of St. Clair v. Lovingston,* 23 Wall. 68, 23 L. Ed. 59; *Barney v. Keokuk,* 94 U. S. 337, 24 L. Ed. 224; *Bridge Co. v. U. S.,* 105 U. S. 491, 26 L. Ed. 1143; *Packer v. Bird,* 137 U. S. 671, 11 Sup. Ct. 210, 34 L. Ed. 819; *Manchester v. Mass.,* 139 U. S. 261, 11 Sup. Ct. 559, 35 L. Ed. 159; *Hardin v. Jordan,* 140 U. S. 381, 11 Sup. Ct. 808, 838, 35 L. Ed. 428; *Knight v. U. S. Land Ass'n,* 142 U. S. 183, 12 Sup. Ct. 258, 35 L. Ed. 974; *Shively v. Bowlby,* 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331; *Lowndes v. Huntington,* 153 U. S. 30, 14 Sup. Ct. 758, 38 L. Ed. 615; *Water Power Co. v. Water Com'r,* 168 U. S. 360, 18 Sup. Ct. 157, 42 L. Ed. 497; *Niles v. Cedar Point Club,* 175 U. S. 308, 20 Sup. Ct. 124, 44 L. Ed. 171; *Scranton v. Wheeler,* 179 U. S. 182, 21 Sup. Ct. 48, 45 L. Ed. 126; *Mobile Transp. Co. v. Mobile,* 187 U. S. 483, 23 Sup. Ct. 170, 47 L. Ed. 266; *Kansas v. Colorado,* 206 U. S. 93, 27 Sup. Ct. 655, 51 L. Ed. 956; *U. S. v. Chandler-Dunbar Co.,* 209 U. S. 451, 28 Sup. Ct. 579, 52 L. Ed. 881; *Ill. Cent. R. Co. v. Illinois,* 146 U. S. 435, 13 Sup. Ct. 110, 36 L. Ed. 1018.

In *United States ex rel. Friedman et al. v. U. S. Express Co.* (D. C.) 180 Fed. 1006, Rogers, District Judge, said:

"It must therefore be conceded that, when Oklahoma was admitted under the federal Constitution into the Union as a state, the act of admission gave to her all the powers and devolved upon her all the duties which belong to the other states under the Constitution, anything in the Enabling Act to the contrary not-

withstanding. She could come into the Union in no other way. By virtue of the Constitution her admission fixed her status and that of her people, to the people of other states, to the other states themselves, and to the federal government. Congress cannot exact of a state—even a state coming into the Union—the surrender or waiver of any of the constitutionally inherent powers of sovereignty under the Constitution or such as belong to the other states; nor can a state either surrender or stipulate away any of its sovereignty or render itself less sovereign than the other states."

In *Edwards v. Leseur*, 132 Mo. 410, 33 S. W. 1130, 31 L. R. A. 815, it is said:

" * * * Neither the Convention nor the Legislature had power, in this respect, to irrevocably bind the people of the state. The right of the people to establish their seat of government at pleasure involves a governmental subject, about which there can be no irrepealable law."

In *Armstrong et al. v. Board of County Commissioners of Dearborn County*, 4 Blackf. (Ind.) 208, appellants there claimed a vested right in the location of a county seat by virtue of certain legislation attempting to locate forever such seat of county government at a certain point. It is said:

"If the claim be available, it clothes the appellant with the power of controlling the general policy of the state, the rights of the people of that country, and the administration of justice in it. The state itself is stripped of one of the inherent and essential attributes of sovereignty."

In *Newton et al. v. Board of County Commissioners, Mahoning County*, 26 Ohio St. 618, it is said:

"The power to establish and remove county seats is one which cannot be parted with by legislative contract. It is not the subject of contract. No case of authority is cited by counsel, and it is presumed none can be shown, sustaining or enforcing any such contract; while several cases are adduced ([ *Armstrong v. Board of Com'rs of Dearborn County*], 4 Blackf. [Ind.] 208; [*Alley v. Denson*], 8 Tex. 297;[*Adams v. Logan County*], 11 Ill. 336; [*Harris v. Shaw*], 13 Ill. 456) to show that it is a contract which there is no legislative power to make."

This case being reviewed by the Supreme Court of the United States (100 U. S. 548-559, 25 L. Ed. 710), it is said:

"The police power of the states, and that with respect to municipal corporations, and to many other things that might be named, are of the same absolute character. Cooley, Const. Lim., p. 232; *Regents v. Williams,* 9 Gill. & J. [Md.] 365 [31 Am. Dec. 72]. In all these cases there can be no contract and no irrepealable law, because they are 'governmental subjects,' and hence within the category before stated. * * * The same reasoning pushed a step further in the same direction would involve the same result with respect to the seat of government of the state. If the state capital were sought to be removed, under the circumstances of this case with respect to the county seat, whatever the public exigencies or the force of the public sentiment which demanded it, those interested, as were the plaintiffs in error, might, according to their argument, effectually forbid and prevent it; and this really could be brought about by means of a bill in equity and a perpetual injunction. It is true that the state cannot be sued without its consent, but this would be a small obstacle in the way of the assertion of so potent a right. Though the state cannot be sued, its officers whose acts were illegal and void may be. *Osborn v. Bank,* 9 Wheat. 738, 6 L. Ed. 204; *Davis v. Gray, supra* [16 Wall. 203, 21 L. Ed. 447]. A proposition leading to such a consequence must be unsound. The parent and the off-spring are alike. *Armstrong v. Com'rs,* 4 Blackf. [Ind.] 208."

Tucker on the Constitution, vol. 1, p. 614, says:

"The states have confided to the Congress as their agent the admission of a state into the Union under the Constitution. Can this constitutional authority in Congress be construed as to invest Congress as an agent with powers to impose conditions upon the new members which the Constitution has not prescribed? And, if so, does the new state enter the Union shorn of its powers *pro tanto* by the agent authorized to open its doors to the new commonwealth without any such condition? The better opinion would clearly be that Congress could not impose as an obligation upon a state at the time of its admission into the Union such a restriction as it had no original power to enact or enforce."

Burgess, in his Political Science and Constitutional Law (volume 2, p. 163), says:

"The conclusion is that the Constitution recognizes no natural right to commonwealth powers in any population, but views these powers as a grant from the sovereign, the state, which latter employs the Congress to determine the moment from which the grant shall be taken. When the Congress discharges this function, however, the commonwealth powers, both as to local government and participation in general government, are vested in the given population by the Constitution, not by the Congress. I cannot convince myself that the Congress has the right to determine what powers the new commonwealth shall or shall not exercise, although I know that the Congress has assumed to do so in many cases. I think the Constitution determines these questions for all the commonwealths alike. Certainly a sound political science of the federal system could never countenance the possession of such a power by the Congress. Its exercise might lead to interminable confusion. In fact, its possession is inimical to the theory of the federal system. As we have seen, that system can only really obtain, where the power-disturbing organ exists back of both the general government and the commonwealths."

Willoughby, in his recent work on the Constitutional Law of the United States (volume 1, p. 238, 1910), says:

"The Constitution, without distinguishing between the original and new states, defines the political privileges, which the states are to enjoy, and declares that all powers not granted to the United States shall be considered as reserved 'to the states.' From this it almost irresistibly follows that Congress has not the right to provide that certain members of the Union, possessing full statehood, shall have their constitutional competences in any manner less than that of their sister states. According to this, then though Congress may exact of territories whatever conditions it sees fit as requirements precedent to their admission as states, when admitted as such, it cannot deny to them any of the privileges and immunities which the other commonwealths enjoy."

In *Stearns v. Minnesota ex rel.*, 179 U. S. 223, 21 Sup. Ct. 73, 45 L. Ed. 174, in an opinion by Mr. Justice Brewer, it is said:

"When Minnesota was admitted into the Union, and admitted on the basis of full equality with all other states, there were within its limits a large amount of lands belonging to the national government. The Enabling Act (Feb. 26, 1857, 11 Stat. 166, c. 60), authorizing the inhabitants of Minnesota to form a constitutional

and state government, tendered certain propositions to the people of the territory, coupled in section 5 with this proviso (11 Stat. 167, c. 60): 'The foregoing propositions herein offered are on the condition that the said Convention which shall form the Constitution of said state shall provide, by a clause in said Constitution, or an ordinance, irrevocable without the consent of the United States, that said state shall never interfere with the primary disposal of the soil within the same, by the United States, or with any regulations Congress may find necessary for securing the title in said soil to *bona fide* purchasers thereof; and that no tax shall be imposed on lands belonging to the United States, and that in no case shall nonresident proprietors be taxed higher than residents.' * * * That these provisions of the Enabling Act and the Constitution, in form at least, made a compact between the United States and the state, is evident. In an inquiry as to the validity of such compact this distinction must at the outset be noticed. There may be agreements or compacts attempted to be entered into between two states, or between a state and the nation, in reference to political rights and obligations, and there may be those solely in reference to property belonging to one or the other. That different considerations may underlie the question as to the validity of these two kinds of compacts or agreements is obvious. It has often been said that a state admitted into the Union enters therein in full equality with all the others, and such equality may forbid any agreement or compact limiting or qualifying political rights and obligations; *Whereas, on the other hand, a mere agreement in reference to property involves no question of equality of status, but only of the power of a state to deal with the nation or with any other state in reference to such property. The case before us is one involving simply an agreement as to property between a state and the nation."* (Italics ours.)

The prohibtion against compacts or agreements between the several states contained in section 3, art. 4, of the federal Constitution, without the consent of the federal Congress, was intended as a limitation upon the states so as to prevent the increase of power among such states by such compacts so as not to become a menace or interference with the supremacy of the United States in the exercise of the delegated rights of the national power. (*Stearns v. Minnesota, supra.*)    Article 10 (tenth amendment)

provides that the powers not delegated to the federal government by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people. A contract or compact may be entered into by the federal government with the state or any individual relative to any property held by it under such delegated powers, such contract being sustained on the ground that it relates to property or proprietary rights, or with the state relative to matter within the exercise of such delegated or national authority. When it comes to a compact with a state, relative to matters pertaining exclusively to its municipal sovereignty, how can it be said that the federal government is acting by virtue of any delegated powers in making such contract or compact? And if it is not acting within such delegated powers, so far as it seeks to irrevocably restrict the state as to its reserved power, by article 10 its act is void. As was said by Mr. Justice Brewer in *Stearns v. Minnesota, supra.*, the intention in not permitting states to contract or enter into compacts between themselves, without the consent of Congress, was for the protection of the national government, thereby preventing encroachment against its delegated powers. The converse is true under the provision of article 10, wherein it is expressly provided that all powers not delegated are retained by the states, for by means of compact the delegated powers could be increased and the retained powers of the state thereby minimized, the federal Constitution amended by such compact, and the powers of the state relative to municipal sovereignty reduced and greatly impaired under the pretense of a contract or compact.

Willoughby, volume 1, p. 240, *supra*, says:

"Beginning with the admission of Nevada, in 1864, the promises exacted of territories seeking admission as states assumed a more political character. Of Nevada it was required that her Constitution should harmonize with the Declaration of Independence, and that the right to vote should not be denied persons on account of their color. Of Nebraska, admitted in 1867, it was demanded that there should be no denial of the franchise or any other right on account of race or color, Indians excepted. Of the states that had attempted secession, still more radical were the require-

ments precedent to the granting to them of permission again to enjoy the other rights which they had for the time being forfeited. Of all of them it was required that there should be, by their laws, no denial of the right to vote except for crime; and of three, that negroes should not be disqualified from holding office, or be discriminated against in the matter of school privileges. Finally, Utah, when admitted as a state in 1894, was required by Congress by the Enabling Act to make by 'ordinance irrevocable without the consent of the United States and the people of the United States, provisions for perfect religious toleration, and for the maintenance of public schools free from sectarian control; and that polygamous or plural marriages are forever abolished.' It would seem that as regards the enforceability of these contracts, a distinction is to be made between those that attempt to place the state under political restrictions not imposed upon all the states of the Union by the federal Constitution, and those which seek the future regulation of private, proprietary interests. The first class of these agreements the Supreme Court has repeatedly held are not enforceable against the state after it has been admitted into the Union."

In *Blue Jacket (Kansas Indians) v. Board of Commissioners of the County of Johnson,* 5 Wall. 737, 18 L. Ed. 672, it is said:

"If the tribal organization of the Shawnees is preserved intact and recognized by the political department of the government as existing, then they are a people 'district from others,' capable of making treaties, separated from the jurisdiction of Kansas, and to be governed exclusively by the government of the Union. If under the control of Congress from necessity, there can be no divided authority. If they have outlived many things, they have not outlived the protection afforded by the Constitution, treaties, and laws of Congress. It may be that they cannot exist much longer as a distinct people in the presence of the civilization of Kansas, 'but until they are clothed with the rights and bound to all the duties of citizens' they enjoy the privileges of total immunity from state taxation."

This compact comes, not within the class that attempts to place the state under political restrictions not imposed upon the other states of the Union by the federal Constitution, but within

that which seeks the future regulation of property or proprietary interests.

Under section 8 of article 1 of the Constitution, one of the specific rights delegated by the several states was to regulate commerce with the Indian tribes. Section 3 of article 4 provides that "Congress shall have the power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States; and nothing in the Constitution shall be so construed as to prejudice any claims of the United States, or of any particular state." Under these provisions the Congress of the United States had authority to regulate the government of this tribe of Indians, the title of said reservation being held by the United States for the benefit of the tribe; just as the title to public domain is held by the United States for the benefit of the citizens of all the states.

The compact that was sustained in the case of the Kansas Indians, *supra,* related to a proprietary interest, and was incident to the exercise, after the admission of the state, of a delegated federal power, and is not in point. As to the case of *Green v. Biddle,* 8 Wheat. 1, 5 L. Ed. 547, that was a compact by virtue of the first paragraph of section 3 of article 4 of the federal Constitution, which provided that "new states may be admitted by the Congress into this Union; but no new state shall be formed or erected within the jurisdiction of any other state; not any state be formed by the junction of two or more states, or parts of states, without the consent of the Legislature of the states concerned as well as of Congress."

The seventh article of the compact made between Virginia and Kentucky, as incorporated in the Kentucky Constitution, upon the separation of the latter from the former state, declares that all private rights and interests in lands therein derived from the laws of Virginia prior to separation shall remain valid and secure under the laws of the proposed state and shall be determined by the laws now existing in this state. These lands had formerly been the property of the commonwealth of Virginia. Having obtained

its independence as a result of the Revolution, and succeeded to the proprietary rights of the Crown to the public lands within that state, this compact falls in that class, pertaining to private property or proprietary interests. For that reason it is not a case in point.

Again, that part of the compact involved in *Green v. Biddle, supra* (seventh article), was incorporated in the Kentucky Constitution, and it requires no argument to demonstrate that a statute enacted by the Legislature must fall when coming in conflict with a provision of the Constitution. Also the foregoing conclusion as to the effect of the decision in the case of *Green v. Biddle* is settled in *Kentucky Union Co. v. Kentucky,* 31 Sup. Ct. at page 181, 55 L. Ed. —, where, in an opinion by Mr. Justice Day, it is said:

"We think the effect of these decisions is to declare that while the Virginia compact prevents the cutting down of the titles secured under the state of Virginia, prior to its date, so as to take away substantial rights incident to the title, as was the case in *Green v. Biddle, supra,* it did not mean to prevent the state, upon notice and hearing, from requiring the registration of land titles for taxation, or, in default thereof, from forfeiting such titles to the state. These laws do not have the effect of taking away legitimate rights secured by the old grants, but enable the new sovereign to enforce against such lands, as well as others, the taxing laws of the state. It was, of course, recognized that the land would pass under the dominion of a new state, which would require revenues for its support, and while the title obtained from the state of Virginia was protected, it was not intended that it should be immune from constitutional laws having the effect to subject such lands to the taxing power of the new sovereignty, and to require their owners, by all proper methods, to contribute their share to the public burdens of the state."

See, also, *German Ins. Co. v. Com.,* 133 S. W. 793; Stinson on Popular Law Making (1910), p. 272.

In *Hogg v. Zanesville Canal & Manufacturing Company,* 5 Ohio, 410, it is said:

"This portion of the Ordinance of 1787 is as much obligatory upon the state of Ohio as our own Constitution. In truth it is more; for the Constitution may be altered by the

people of the state, while this cannot be altered without the assent both of the people of this state and of the United States through their representatives. It is an article of compact, and until we assume the principle that the sovereign power of the state is not bound by compact, this clause must be considered obligatory."

This case cannot be considered as an authority. In *Graham v. Strader, supra*, the Supreme Court of the United States held that the Ordinance of 1787 fell with the admission of Ohio into the Union, and thereafter had no binding effect upon the state. That has been the universal holding in every state that was carved out of the northwest territory. Not only the Supreme Court of the United States, but the Supreme Court of every other state has so held, except that of Ohio, and that of itself destroys the effect of the holding of this court. But even if the Ordinance of 1787 had been attempted to be brought over by compact under the holding in *Pollard v. Hagan*, that clause of the Ordinance, to wit, "That the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the said Territory as to the citizens of the United States and those of any other state that may be admitted into the Confederacy, without any tax, impost, or duty therefor," could be sustained as a proper exercise of delegated federal power by virtue of section 8, art. 1, as incident to the regulation of commerce, etc. In *Pollard v. Hagan, supra*, it is said:

"The declaration, therefore, contained in the compact entered into between them when Alabama was admitted into the Union 'that all navigable waters within the said state shall forever remain public highways, free to the citizens of said state, and of the United States, without any tax, duty, or toll therefor, imposed by the said state,' would be void if inconsistent with the Constitution of the United States. But is this provision repugnant to the Constitution? By the eighth section of the first article of the Constitution power is granted to Congress 'to regulate commerce with foreign nations, and among the several states.' If, in the exercise of this power, Congress can impose the same restrictions upon the

original. states, in relation to their navigable waters, as are imposed by this article of the compact on the state of Alabama, then this article is a mere regulation of commerce among the several states, according to the Constitution, and, therefore, as binding on the other states as Alabama."

The same applies also to *Duke v. Cahawba Navigation Co.*, 10 Ala. 82, 44 Am. Dec. 472, as the provision there under consideration is the same as that contained in *Pollard v. Hagan*, and was within the delegated federal powers. It cannot be considered in point where it is sought to restrict irrevocably the municipal sovereignty of the state.

In *Minnesota v. Batchelder*, 1 Wall. 108, 17 L. Ed. 551, the contract related to a grant of public lands or federal proprietary rights. *Cooper v. Roberts*, 18 How. 173, 15 L. Ed. 340, pertains also to a compact in which public lands or federal proprietary rights were granted to a new state. In this case the opinion is by Mr. Justice Campbell. It is difficult to see how this case can be cited to sustain a compact imposing an irrevocable restriction as to the local, municipal, or police power of a new state, in the light of the excerpt by Mr. Justice Campbell, *supra,* quoted from the Dred Scott Case.

*Beecher ex rel v. Wetherby et al.*, 95 U. S. 517, 24 L. Ed. 440, is the same as *Cooper v. Roberts, supra,* relating to grant of lands and is not in point.

The case of *Bennett v. Boggs,* Baldw. 60, 3 Fed. Cas. 221, involved the validity of a compact between New Jersey and Pennsylvania, made in 1783. It has never been doubted that the colonies under the Confederation had authority to make compacts. The case of *Spooner v. McConnell et al.,* 1 McLean, 337, 22 Fed. Cas. 939, Mr. Justice McLean sitting on the circuit, held that certain parts of the Ordinance of 1787, under the government of the northwest territory, remained in force in the state of Ohio after its admission into the Union. This decision was rendered in December, 1838. That in *Strader v. Graham, supra,* was made by the Supreme Court of the United States in 1850, wherein the con-

trary was held, to wit: That the Ordinance of 1787 was superseded by the adoption of the Constitution of the United States, which placed all the states of the Union on a perfect equality; this would not be the case if the Ordinance continued to be in force after its adoption. That opinion was fully concurred in by Justices Wayne, McKinley, Daniel, Nelson, Woodbury, and Greer. Justice McLean concurred in the conclusion, and not in that part of the opinion which held that the ordinance of 1787 was superseded by the federal Constitution. Mr. Justice Catron also took the contrary view to that of the majority. This opinion, with the dissent, shows that *Spooner v. McConnell* was repudiated by the Supreme Court of the United States.

As to the *obiter* of Justice McLean in *Spooner v. McConnell et al., supra,* wherein it is said:

"The state has been admitted into the Union on an equal footing with the original states. And yet the state is bound by compact not to tax the lands of the United States, nor until the expiration of five years after they have been sold. The power to tax is an incident to sovereignty. Does this exemption take away or lessen this power? If it does, in the sense contended, then the state of Ohio was not admitted into the Union, with the same powers of sovereignty as the original states. This consequence is not obviated by the fact that this was a restriction imposed, with the consent of the state, for an equivalent. If it be an abridgment of the sovereign power of the state, the objection stands in its full force. The compact not to tax was the voluntary act of the people of the state, but not more so than was the compact by the same people that the navigable waters should be common highways. And this exemption from taxation is as much a restriction on the exercise of the sovereign power, as the exemption of the navigable streams from obstruction by the same power. The right to authorize works on a navigable stream, which may, to some extent, obstruct its navigation by the sovereign power of the state, is not less clear, on general principles, than the right to tax. By compact with the federal government, the national road that lies within the state is to be kept in repair by tolls imposed by the state for that purpose. The state cannot, under this compact, vacate this

road, as it may all public roads established by its authority; and does this compact abridge the sovereignty of the state?"

As heretofore pointed out in *Stearns v. Minnesota, supra,* there is a distinction between an agreement or compact, qualifying political rights, and one placing restrictions upon property or proprietary rights, which distinction is approved by Willoughby on the Constitution, vol. 1, § 115, p. 242. This *dictum* by Mr. Justice McLean does not fall alone by this distinction, but it has been expressly repudiated by the Supreme Court of the United States.

In *Stone v. State of Mississippi,* 101 U. S. 814, 25 L. Ed. 1079, wherein the state by *quo warranto* sought to oust a certain lottery company from doing business in the state, defendant claimed the right under a certain act of the Legislature of issuing and vending lottery tickets, neither the act, nor the Constitution, nor the general laws of the state at any time having reserved the right to repeal the same. The court, in passing on the question, said:

" 'That the framers of the Constitution did not intend to restrain states in the regulation of their civil institutions, adopted for internal government, and that the instrument they have given us is not to be so construed.' The present case, we think, comes within this limitation. We have held, not, however, without strong opposition at times, that this clause protected a corporation in its charter exemptions from taxation. While taxation is, in general, necessary for the support of the government, it is not part of the government itself. Government was not organized for the purpose of taxation, but taxation may be necessary for the purpose of government. As such, taxation becomes an incident to the exercise of the legitimate functions of government, but nothing more. No government, dependent on taxation for support, can bargain away its whole power of taxation, for that would be, substantially, abdication. All that has been determined thus far is that for a consideration it may, in the exercise of a reasonable discretion, and for the public good, surrender a part of its powers in this particular. But the power of governing is a trust committed by the people to the government, no part of which can be granted away."

No legislative body or agency on the part of the state can di-

vest itself or the state of the right to exercise the police power when it is necessary to protect the peace, good morals, health or property of the people. *Birmingham Mineral R. Co. v. Parsons,* 100 Ala. 662, 13 South. 602, 27 L. R. A. 263, 46 Am. St. Rep. 92; *Barlow v. Gregory,* 31 Conn. 261; *People v. Hawley,* 3 Mich. 330; *Beer Co. v. Massachusetts,* 97 U. S. 25, 24 L. Ed. 989; *Stone v. Mississippi,* 101 U. S. 814, 25 L. Ed. 1079; *Slaughterhouse Cases,* 16 Wall. 36, 21 L. Ed. 394; *Fertilizing Co. v. Hyde Park,* 97 U. S. 659, 24 L. Ed. 1036; *New Orleans Gas Co. v. Louisiana Light Co.,* 115 U. S. 650, 6 Sup. Ct. 252, 29 L. Ed. 516.

*Hancock v. Walsh,* 3 Woods, 351, 11 Fed. Cas. 403, related to a colonization contract made by the republic of Texas with an individual, thus pertaining to property or proprietary rights, and comes within the distinction made in *Stearns v. Minnesota, supra.* Besides, when such contract was made Texas was a republic and not a member of the federal Union.

In *Gray v. Davis,* 1 Woods, 420, 10 Fed. Cas. 1007, an act of the Legislature of Texas, whereby a railroad company was incorporated and granted lands, was held to be a contract between the state and the company, within the meaning of section 10 of article 1 of the Constitution of the United States. This is undoubtedly the law. This case was affirmed 16 Wall. 203, 21 L. Ed. 447. The same rule is announced in *Marsh et al. v. Burroughs et al.,* 1 Woods. 464, Fed. Cas. No. 9,112.

In *Virginia v. West Virginia,* 11 Wall. 39, 20 L. Ed. 67, was involved a compact between two states, which was assented to by an act of Congress, coming within section 3 of article 4 of the Constitution of the United States.

In *Ft. Leavenworth R. Co. v. Lowe,* 114 U. S. 525, 5 Sup. Ct. 995, 29 L. Ed. 264, the contract was incident to a valid exercise of federal power under article 1, § 8, of the federal Constitution.

In *United States v. Partello* (C. C.) 48 Fed. 670, it was held that as to Indian reservations Congress might have jurisdiction

over the same and under any treaty made in pursuance thereof. Congress has authority to legislate with reference to the Indian country, whether it is within a state or territory. *U. S. v. Yellow Sun,* 1 Dill. 272, Fed. Cas. No. 16212; *U. S. v. McBratney,* 104 U. S. 621, 21 Sup. Ct. 924, 45 L. Ed. 1032; *Ft. Leavenworth R. Co. v. Lowe,* 114 U. S. 525, 5 Sup. Ct. 995, 29 L. Ed. 264.

In *Dick v. United States,* 208 U. S. 340, 28 Sup. Ct. 399, 52 L. Ed. 521, the syllabus is as follows:

"The words 'Indian country,' as used in U. S. Rev. St. § 2139, as amended and re-enacted by the act of July 23, 1892 c. 234, 27 Stat. 260, forbidding the introduction of intoxicating liquors into such country, do not, standing alone, embrace territory in which, at the time, the Indian title had been extinguished, and over which, with its inhabitants, the jurisdiction of the state, for all purposes of government, was full and complete. The stipulation in the agreement of May 1, 1893, between the United States and the Nez Perce Indians, that the federal laws prohibiting the introduction of intoxicating liquors into the Indian country shall, for a period of twenty-five years, apply to the lands thereby ceded to the United States and to those retained by the Indians and to those allotted to them in severalty, was a valid regulation, based upon the treaty-making power of the United States and upon the power of Congress to regulate commerce with the Indians, and was not an invasion of the sovereignty of the state of Idaho, which had, by the act of 1890 (Act July 3, 1890, c. 656, 26 Stat. 215), been admitted into the Union upon an equal footing with the other states."

In that case the contention of the accused was that the United States had no jurisdiction over lands within the state which were owned in fee by white citizens, although they may have once been the property of an Indian tribe, and were acquired by the United States subject to the condition that the acts of Congress relating to a named subject should remain in force, for a prescribed period, over such territory. Relative thereto, in an opinion by Mr. Justice Harlan, it is said:

"In determining the extent of the power of Congress to regulate commerce with the Indian tribes, we are confronted by certain principles that are deemed fundamental in our governmental sys-

tem.  One is that a state, upon its admission into the Union, is thereafter upon an equal footing with every other state and has full and complete jurisdiction over all persons and things within its limits, except as it may be restrained by the provisions of the federal Constitution or by its own Constitution.  Another general principle, based on the express words of the Constitution, is that Congress has power to regulate commerce with the Indian tribes, and such power is superior and paramount to the authority of any other state within whose limits are Indian tribes.  These fundamental principles are of equal dignity, and neither must be so enforced as to nullify or substantially impair the other.  In regulating commerce with the Indian tribes Congress must have regard to the general authority which the state has over all persons and things within its jurisdiction.  So, the authority of the state cannot be so exerted as to impair the power of Congress to regulate commerce with the Indian tribes."

This act of Congressional legislation was sustained under the provision of the federal Constitution (section 8, art. 1) specifically granting to Congress the power to regulate or control commerce with the Indians, and is a well-recognized grant of authority.  This decision merely construed that authority to apply to the conditions therein named.  But where in the federal Constitution is there any delegated federal authority to temporarily designate the capital of a state and to require that sovereign state, admitted upon an equality with the original states of the Union, to stipulate, by irrevocable compact, or otherwise, that it will not remove it for a certain designated time?  How can this be said to be an incident to any delegated national authority?

*U. S. v. Celestine*, 215 U. S. 278, 30 Sup. Ct. 93, 54 L. Ed. —, arose within the limits of an Indian reservation, as did *U. S. v. Sutton*, 215 U. S. 291, 30 Sup. Ct. 116, 54 L. Ed. —, and was incidental to a proper exercise of federal power under section 8, art. 1, of the Constitution of the United States.

The case of *Romine v. State et al.*, 7 Wash. 215, 34 Pac. 924, which related to certain lands granted by the federal government to the state, involved a property or proprietary interest, and there is no question but that such a contract is binding.  We repeat

that there is not a solitary adjudicated case where the question was directly involved which has not been repudiated by the United States Supreme Court, which holds the federal government, except where it is by the exercise of a federal power which could be exercised by Congress as well after the admission of a state as before, could make a compact and irrevocably limit the police or municipal or internal power of the state after its admission.

In *Higgins v. Brown, Judge, et al.,* 20 Okla. 355, 94 Pac. 703, it was held that sections 16 to 20, inclusive, of the Enabling Act for Oklahoma (Act June 16, 1906, c. 3335, 34 Stat. 276, 277), as amended March 4, 1907, c. 2911, 34 Stat. 1286, 1287, when concurred in by the state of Oklahoma by the adoption of sections 27 and 28 of the Schedule to the Constitution, being a proper exercise of power by the Congress under article 4, § 3, of the Constitution of the United States, are valid. It was held that the offense of murder therein charged came within a local law for the government of territories, the prosecution of which may be continued in the state courts after the admission of such territory as a state, on the theory that had the Indian Territory been treated by Congress as an Indian reservation proper, section 2145 of the Revised Statutes of the United States, as a general federal statute, would have applied, but section 31 of the act of May 2, 1890, c. 182, 26 Stat. 94, specifically causing such statute to apply to the area embraced within the boundaries of Indian Territory, it was as much a local law for the government of the territory as were the statutes of Arkansas extended to the Indian Territory by said act. This construction is in entire harmony with the decision of the Supreme Court of the United States in *Pickett v. United States,* 216 U. S. 456, 30 Sup. Ct. 265, 54 L. Ed. —, wherein it is said:

"It was, therefore, altogether competent for Congress to provide, as it did in the fourteenth section of this Enabling Act, for the transfer of jurisdiction in respect of all crimes against the United States—for the act must be read as applying to crimes under the *general* (italics our own) criminal law of the United

States— to the federal courts provided by the same act. If this could not be done, the change from a territorial condition to that of a state would operate as an automatic amnesty for crimes committed against the *general* (italics our own) laws of the United States within districts exclusively under its jurisdiction, and not within the jurisdiction of any state, for the court of the state could not be empowered to prosecute against the laws of another sovereignty."

Section 31 of the act of May 2, 1890, is not a general law of the United States, but one applying specially to the Indian Territory. Said section of the Enabling Act having provided for the transfer of all pending criminal actions, not transferred to the United States Circuit or District Court in the state, to the state courts to be proceeded with, held and determined by the courts of said state, etc., pursuant to section 22 of the original Enabling Act, and the Constitutional Convention, by ordinance irrevocable. accepted the terms and conditions thereof, it is insisted that this is a compact relating to the municipal sovereignty of the state imposed by Congress. Said case is not in point to sustain the irrevocable binding force of the compact as to the location of the capital. If the crime charged in that case involved the violation of a general statute of the United States, it would be a crime against the national sovereignty, and, as said by Mr. Justice Lurton in the Pickett Case, could not be delegated by compact or otherwise to the state to prosecute. But when it is an offense against a local or special law of the United States in force in a territory or particular area, Congress, in enacting such special or local law by virtue of section 3, art. 4, of the Constitution of the United States, is the agent of the sovereignty of the state *in futuro,* or, as has been said, *in utero*—the womb of time. When the state undertook to prosecute such offenses, it was neither adding to nor impairing any local sovereignty. It was assuming burdens formerly borne by its agent. However, it would have been permissible for Congress (the agent) to have constituted a special tribunal to have prosecuted these pending cases, or criminal actions that arose, up to the time of the admission of the state, against special or local laws. *Hendrix v. U. S.* (decided by the Supreme Court of

the United States at its December, 1910, term) 31 Sup. Ct. 193, 55 L. Ed. ——. When the compact was made as to the prosecution of cases against local or special federal laws, the federal government, under its power to govern territories and to provide in its discretion for the admission of new states, was surrendering a power as to the prosecution of such cases to the new state that it was exercising for the unborn commonwealth. The same applies also to *Ex parte Bailey*, 20 Okla. 497, 94 Pac. 553.

Again, if, as said in the Pickett Case, Congress could not delegate, by compact or otherwise, a part of its national sovereignty to the state of Oklahoma, to wit, could not empower state courts to prosecute crimes committed against the national sovereignty, is not the converse equally true that the state cannot by compact irrevocably surrender a part of its municipal sovereignty?

Section 1321, p. 200, vol. 2 (5th Ed.) Story on Constitutions, is cited by the plaintiff as supporting his contention that the compact as to the temporary location of the capital was irrevocably binding. At the time the preliminary acts were taken for the admission of the state of Missouri into the Union, an attempt was made by the House to impose a restriction as to slavery on the state as a condition of its admission. The debates at that time show that the restriction was imposed in the House by a very small majority, it being strenuously insisted in the debates of that body at that time that the federal government had no power to irrevocably bind the state as to any internal or municipal governmental power. In the Senate this restriction was stricken out, and in lieu thereof a clause was inserted that "all the territory ceded by France to the United States under the name of Louisiana, which lies north of thirty-six degrees and thirty minutes north latitude, not included within the limits of the state contemplated by that act, slavery and involuntary servitude, otherwise than in the punishment of crimes, whereof the parties shall have been duly convicted, shall be and is hereby forever prohibited." None of said territory then was embraced in any state of the Union. In 1854 this act was repealed, and one of the reasons given for it was

that it was contended that Congress had no right to impose such
a condition upon the states after they were admitted.   It would
seem that the action of Congress on the slavery question, as to the
right to impose a restriction upon a state, could not be considered
as an authority in favor of or against the plaintiff.   (*Dred Scott v.
Sanford, supra*).   As to the requirement of Louisiana that all the
proceedings of its courts after it became a state should be printed
in the English language, nowhere within the proceedings of that
debate is there any contention that the state was irrevocably bound
as to such governmental limitations.   At the time of the passage
of the Enabling Act for the admission of Utah when the polygamy
requirements were inserted as a condition of its admission, nowhere
does it appear in the debates to have been urged that the power
to irrevocably bind the state as to the exercise of its police or
municipal governmental powers was urged.   At the time of the
passage of the Enabling Act for the admission of Oklahoma, by
far the greater majority of the great lawyers of the Senate specif-
ically stated and urged that it was beyond the power of Congress
to shackle an unborn state and bring it into the Union with her
police or local governmental powers irrevocably restricted.   Mr.
Story in section 1321, *supra*, cited *Biddle v. Green, supra*, as an
authority that a restriction may be imposed upon state sovereignty.
In section 1403, at page 276, Story on the Constitution, we find:

"The latter clause, 'compacts and agreements,' might then
very properly apply to such as regarded what might be deemed mere
private rights of sovereignty; such as questions of boundary; in-
terests in land situate in the territory of each other; and ·other
internal regulations for the mutual comfort and convenience of
states bordering on each other.   Such compacts have been made
since the adoption of the Constitution.   The compact between
Virginia and Kentucky already alluded to, is of this number.
Compacts settling the boundaries between states are, or may be,
of the same character.   In such cases, the consent of Congress may
be properly required in order to check any infringement of the
rights of the national government; and, at the same time, a total
prohibition to enter into any compact or agreement might be at-
tended with permanent inconvenience or public mischief."

Judge Story recognized in *Biddle v. Green* the same distinction as did Mr. Justice Brewer in *Stearns v. Minnesota, supra.*

This state was admitted under an enabling act (June 16, 1906), entitled "An act to enable the people of Oklahoma and of the Indian Territory to form a Constitution and state government and *be admitted into the Union on an equal footing with the original states.*" (Italics ours.)

Section 30 of the Bill of Rights of the Constitution of Massachusetts, as framed in the midst of the Revolution by a convention composed of such men as Samuel and John Adams, John Hancock, Robert T. Paine, James Bowdoin, Samuel Holton, Nathaniel Gorham, Increase Sumner, James Sullivan, Caleb Strong, Levi Lincoln, William Cushing, John Lowell, George Cabot, and Benj. Goodhue, is as follows:

"In the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them. To the end it may be a government of law and not of men."

It has been said that the membership of this Convention embraced "a union of talent and patriotism such as the country had never seen up to that time, and whose superior has not been since." Robert C. Winthrop's Addresses and Speeches, Boston, 1886, vol. 4, 171.

The power of the judiciary to declare an act repugnant to the Constitution has been exercised by the Supreme Court of the United States, beginning in 1803 with *Marbury v. Madison*, 1 Cranch, 137, 2 L. Ed. 60 to this day without a single dissent as to such power. With the provisions of the fourteenth amendment that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor to deny to any person within its jurisdiction the equal protection of the laws," resting upon every state,

and the Supreme Court of the United States as the final tribunal
to determine whether such has been done, it would be futile for
a state court at this late date to set up the doctrine that this is
a government of men and not a government of law.

The different state courts have exercised the power of declar-
ing statutes to be unconstitutional, beginning with Rhode Island
in 1787, when the invalidity of a statute passed by the General
Assembly of that state in 1786, depriving parties charged with
certain offenses of the right of a trial by jury, was held to be void
(Coxe on Judicial Powers and Constitutional Legislation, pp. 234,
246), and North Carolina in 1787, the same month when the Con-
vention to frame the Constitution of the United States was gather-
ing at Philadelphia, held an act of the Legislature of that state,
depriving certain persons of the right of a trial by a jury, to be
unconstitutional, saying:

"That by the Constitution every citizen had undoubtedly a
right to a decision of his property by a trial by jury. For that if
the Legislature could take away this right, and require him to
stand condemned in his property without a trial, it might with as
much authority require his life to be taken away without a trial
by jury, and that he could stand condemned to die, without the
formality of any trial at all; that if the members of the General
Assembly could do this, they might with equal authority, not only
render themselves the legislators of the state for life, without any
further election of the people, from thence transmit the dignity
and authority of legislation down to their heirs male forever. But
that it was clear that no act they could pass, could by any means
repeal or alter the Constitution, because if they could do this they
would, at the same instant of time, destroy their own existence as a
Legislature, and dissolve the government thereby established. Con-
sequently the Constitution (which the judicial power was bound
to take notice of as much as of any other law whatever) standing in
full form as the fundamental law of the land, notwithstanding the
act on which the present motion was grounded, the same act must
of course, in that instance, stand as abrogated and without any
effect." *(Bayard et ux. v. Singleton*, 1 Mart. [N. C.] 5.)

In *Eakin et al. v. Raub et al.*, 12 Serg. & R. (Pa.) 330, the only

case where there appears to be even a dissent as to such power, it is said:

"Maintaining, as I do, the power and the duty of the court to decide on the constitutionality of all the acts of the Legislature, yet it is one which all courts will approach with caution and circumspection, and with every proper respect for a co-ordinate branch of the government, and with great reluctance will they pronounce an act of the Legislature unconstitutional, and only when it comes in undoubted collision with the Constitution of the United States, or with that of this state. But it is a duty, however irksome, which they are bound to perform, without regard to personal considerations; for no principle can be better established—none more conducive to personal liberty and security of property; none of which the people of this country can more justly boast; none which so pre-eminently distinguishes our American Constitutions over every other country and government—than the doctrine, which has prevailed since their formation, in the courts of all these states from Maine to Georgia that the people possess the sovereign right to limit their lawgiver, and that acts contrary to the Constitution are not binding as laws. The concurrence of statesmen, of legislators, and of jurists, uniting in the same construction of the Constitution, may insure confidence in that construction."

Section 2 of article 6 of the federal Constitution is as follows:

"This Constitution and the laws of the United States, which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."

How can a judge be bound by the Constitution of the United States and all laws or treaties made pursuant thereto, unless he is to determine whether the same are made pursuant thereto? As a legal question, the power of the courts of this republic to declare an act unconstitutional, when in fact it is, seems to be long ago settled. With every proper and reasonable respect for the co-ordinate branches of the state government and the acts of Congress of the United States under the authorities and reasons heretofore set out, I have reached the conclusion, beyond a reasonable doubt,

that the irrevocable restriction sought to be imposed upon the state by the federal Congress is void, and with the universal recognized authority of the judiciary to declare not only acts of the Legislature, but also those of Congress, when the question is properly raised and such repugnancy appears to a moral certainty, to be void, it is so declared in this instance. Neither Congress nor the Constitutional Convention had any power to bind the state irrevocably, by compact or otherwise, as to the location of its seat of government temporarily at the city of Guthrie, and not to be changed therefrom previous to *Anno Domini* 1913, and after said year to be located by the electors of said state at an election to be provided for by the Legislature.

As the irrevocable part of the compact at least falls—that is, that part of it wherein it seeks to irrevocably bind the state so that it cannot change the seat of government prior to 1913, nor thereafter except by a vote of the electors of the state at an election to be provided for by the Legislature—the question arises as to whether that part of the compact as a part of an ordinance passed by the Convention temporarily fixing the seat of government stands, and, if so, what is its effect and how can it be repealed? For the purpose of this case it will be assumed that it stands as a part of an ordinance (*State of Pennsylvania v. Wheeling, etc., Bridge Co., et al.,* 13 How. 518, 14 L. Ed. 249) temporarily locating the seat of government at Guthrie. In *Frantz et al. v. Autry,* 18 Okla. 561, 91 Pac. 193, it is said:

"An ordinance as used in this act (referring to the Enabling Act) has the force and effect of a legislative enactment or law for the purpose therein named. Manifestly, it is a law which is essential to carrying into effect the objects for which the Convention was created. Thus we speak of the famous Ordinance of 1787, which created a government of that portion of the territory of the United States northwest of the Ohio river and known as the 'Northwest Territory.' It will thus be seen that Congress conferred direct and express power and authority upon the Convention to pass an appropriate ordinance to submit the Constitution to the people for its ratification or rejection, at an election at a time fixed in said

Ordinance, by the Convention. Such an ordinance, when once adopted by the Convention, has the force and effect of a statute law. The distinction between a Constitution and an ordinance is this: The Constitution is a permanent fundamental law of the state. It is of a stable and permanent character. As is appropriately held in *Van Horne v. Dorrance*, 2 Dall. 308 [1 L. Ed. 391]: 'The Constitution of a state is stable and permanent, and not to be worked upon by the temper of the times, nor to rise and fall with the tide of events; notwithtsanding the competition of opposing interests, and the violence of contending parties, it remains firm and immovable, as a mountain midst the strife of storms, or a rock of the ocean amidst the raging of the waves.' But under the terms of the Enabling Act, it is prospective in its operation only. That is, it does not become operative until it is ratified by the people and approved by the President of the United States. On the other hand, an ordinance, as used in this act, refers to a merely temporary law, its object being to carry into effect the formation of the Constitution and fundamental law of the state, to provide a mode of means for an election of a full state government. including the members of the Legislature and five representatives to Congress, and becomes operative immediately upon its adoption."

Section 22 of the Enabling Act (June 16, 1906) provided that "the Constitutional Convention provided for herein shall, by ordinance irrevocable, accept the terms and conditions of this act." When the irrevocable part falls, that part of the ordinance, if any remains, is simply an ordinance in a legislative sense. At the time the Constitution was finally framed and submitted by the Convention, its members were aware of the construction that had been placed on the term "ordinance" in said Enabling Act, by the court in *Frantz et al. v. Autry et al.*, members of the Convention being attorneys for the side procuring such holding. Practically all the provisions of the Enabling Act required to be agreed to or continued by compact by irrevocable ordinance, were incorporated in the Constitution. See article 1, Federal Relations; article 11, State & School Lands; sections 2, 26, 27, 28, and 36 of the Schedule; and paragraph relating to Osage county, in section 8, art. 17, of the Constitution. Such provisions, except as they may be contracts inviolable, were then subject to amendment under

the initiative and referendum provisions for the amending of the Constitution. Section 2, art. 5, and article 24 of the Constitution; section 1, art. 2, Const. Many provisions in the Enabling Act were required to be incorporated or provided for in the Constitution, as, for instance, the toleration of religious worship, prohibition as to manufacture, etc., of intoxicating liquor, the assumption of the debts of the territory of Oklahoma by the state, public schools, and the right of suffrage. See section 3 of the Enabling Act. The fact that the Constitutional Convention incorporated into the Constitution provisions of the Enabling Act, other than those specifically required, and omitted that relative to the temporary loation of the capital, is significant. And especially is this so, as the Convention accepting the terms of the amendments to the Enabling Act (March 4, 1907), made the same a part of the Constitution, not accepting the same by ordinance. Section 28 of the Schedule.

There are only two kinds of provisions known in written law; one fundamental and subject to be changed only by amendment of the Constitution or new Constitution, and the other legislative' or statutory, and subject to be repealed by legislative action, or bodies exercising sovereign legislative authority.

If this ordinance is of a fundamental character and not repealable as a statute, it can neither be repealed by the Legislature, nor by the people through the initiative and referendum in a legislative capacity. There being no way provided in the organic law for its amendment or repeal, if it is fundamental law it could only be abrogated by calling a new Constitutional Convention. The only rational conclusion is that the Constitutional Convention sought to do only what it was required to do by its acceptance of that provision by an ordinance. Contracts, as a rule, by states and municipalities, are created by legislative acts or legislative ordinances. In the *Richmond Mayoralty Case*, 19 Grat. (Va.) at page 712, it is said that "if a Convention, in framing the Schedule, should plainly show an intention to place any of its provisions be-

yond the control of the Legislature, such provision, being the act of the representatives of the sovereignty of the state without any constitutional restrictions, would be as effectual and binding as if they were embodied in the Constitution itself." Obviously, if such rule applies to the Schedule, much more so would it apply to an Ordinance, and the burden would rest upon the plaintiff to plainly show that it was the intention of the Convention to make such Ordinance a fundamental law and place it beyond the power of legislative action. The foregoing provisions incorporated in the the Constitution, as well as the history of the action of that Convention, stand like a stone wall against such contention. If it is not irrevocable and the other part temporary, obviously it was not contemplated by the framers, or the people, that it was so fundamental that it could not be changed or repealed by the Legislature, especially when it was specially provided (section 7, art. 5, Const.) :

"The reservation of the powers of the initiative and referendum in this article shall not deprive the Legislature of the right to repeal any law, propose or pass any measure, which may be consistent with the Constitution of the state and the Constitution of the United States."

In section 85, p. 84, Jameson on Constitutional Conventions, it is said:

"Ordinary laws are enactments and rules for the government of civil conduct, promulgated by the legislative authority of a state, or deduced from long-established usage. It is an important characteristic of such laws that they are tentatory, occasional, and in the nature of temporary expedients. Fundamental laws, on the other hand, in politics, are expressions of the sovereign will in relation to the structure of the government, the extent and distribution of its powers, the modes and principles of its operation, and the apparatus of checks and balances proper to insure its integr'ty and continued existence. Fundamental laws are primary, being the commands of the sovereign establishing the governmental machine, and the most general rules for its operation. Ordinary laws are secondary, being commands of the sovereign, having reference to the exigencies of time and places resulting from the ordinary working of the machine. Fundamental laws precede ordinary laws in point of time, and embrace the settled policy of the state. Or-

dinary laws are the creatures of the sovereign, acting through a body of functionaries existing only by virtue of the fundamental laws and express, as we have said, the expedient, or the right viewed as the expedient, under the varying circumstances of time and place."

A constitutional convention for a proposed state has the inherent authority to do those things that are necessary to create the machinery for the submission of the Constitution to the people for approval or rejection, and to provide a temporary set of officers. *Frantz et al. v. Autry et al.*, 18 Okla. 561, 91 Pac. 193. That is a legislative act. Likewise it would have the inherent authority to provide a temporary seat of government. This is the exercise of a purely legislative power. When the Congress, as the agent of the unborn sovereign state, provided, as was done in this case (section 4 of the Enabling Act), that the Constitution shall be submitted to the people for ratification or rejection, at which election "the qualified voters for said proposed state shall vote directly for or against the proposed Constitution, and for or against any provisions separately submitted," it was contemplated that the entire Constitution should be submitted to the people for ratification or rejection. In *Ex parte Birmingham & A. R. Co.*, 145 Ala. 530, 42 South. 123, it is said:

"In the case of *Stewart v. Crosby*, 15 Tex. 546, the ordinance was upheld because it was appended to the Constitution as a part of the fundamental law of the land and was adopted by the people along with the Constitution. Besides, the Supreme Court of Texas, in the case of *Quinlan v. H. & T. C. Ry Co.*, 89 Tex, 376, 377, 34 S. W. 738, in commenting on the Crosby Case, *supra,* says: 'We are of the opinion, however, that the ordinance was not valid. The Convention which met on June 1, 1868, was assembled in pursuance of an act of Congress' passed March 23, 1867. It was called for the purpose of framing a Constitution for the state, with a view to its restoration to the Union. The Constitution to be framed by it was to be submitted for ratification to a vote by the people. See Act Cong. March 23, 1867, c. 6, §§ 3, 4, 15 Stat. 2, 3; 2 Paschal's Dg. p. 1093. The act of Congress did not invest the Convention with the power of independent legislation. It is

true that the question of the propriety of incorporating any specific provisions into the fundamental law was for the sole determination of the Convention.' "

Acts of the Constitutional Conventions, other than incorporating provisions (fundamental) in the Constitution of the state are here referred to as independent legislation. Where the ordinance is framed as a part of the Constitution it is, of course, a fundamental law, and can only be changed by amendment of the Constitution or a new Constitution. We can find no case in which an ordinance has been held as a part of the fundamental law where the Constitution was submitted to the electors for ratification or rejection, unless the ordinance was also submitted. There are cases in which the ordinance was appended to the Constitution as a part thereof where said Constitution was adopted and promulgated without having been first submitted to the electors for ratification or rejection, holding such ordinance to be a part of the fundamental law. *Kamper v. Hawkins,* 1 Va. Cas. 20; *Brenner v. Porter,* 9 How. 235, 13 L. Ed. 119. There is nothing in *Willis v. Kalmbach,* 109 Va. 475, 64 S. E. 342, 21 L. R. A. (N. S.) 1009, to the contrary. We have not been able to find any case holding, the Constitution having been submitted to the electors for ratification or rejection, and an ordinance passed by the same Convention not being submitted, such ordinance to be a part of the Constitution or fundamental law of the state. The Enabling Act for New Mexico and Arizona (June 20, 1910, c. 310, 36 Stat. 559, 560, 570, 571) provides that such Convention shall provide by ordinance irrevocable, "No election shall be called or provided for prior to the thirty-first day of Dec., 1925," and that such ordinance by proper reference shall "be made a part of any Constitution that shall be formed." Obviously this is a congressional interpretation that when the Constitution is to be submitted to the electors for ratification or rejection, an ordinance not also submitted does not become a part of the fundamental law of the state. This ordinance comes under the head of "independent legislation" de-

fined in *Stewart v. Crosby, supra,* and approved in *Ex parte Birmingham & A. R. Co., supra.*

The views herein expressed as to the invalidity of the Enabling Act pertain only to that provision of the same locating the capital and prohibiting the removal of the same prior to 1913, and have no reference to those provisions granting lands or moneys to the state, or pertaining to matters incident to the exercise of delegated federal powers.

The questions of law here involved no doubt affect many parties intensely. I have nothing to do with the policies, the motives, or the acts that brought about such conditions. That was a matter for the consideration of other departments of this state government and their constituencies. The conclusions herein reached as to the law are, to my mind, clear, and such being the case my duty is plain. The demurrer to the plaintiff's petition is sustained, petition dismissed, and judgment rendered against the plaintiff.

TURNER, C. J., and HAYES, J., concur; DUNN and KANE, JJ., dissent.

———

DUNN, J. (dissenting). To the conclusion reached in the majority opinion of this court that the ordinance irrevocable passed by the Constitutional Convention was merely a law which the state Legislature was authorized to repeal and that it could permanently locate the state capital without submitting the question to a vote of the people, I am constrained to dissent. Congress, in the Enabling Act, approved June 16, 1906, made as one of the conditions for the admission of the state that the citizens occupying the territory embraced within its boundaries should, in accordance with section 22 of said act, accept and pass an irrevocable ordinance, providing that "the capital of said state shall temporarily be at the city of Guthrie, in the present territory of Oklahoma, and shall not be changed therefrom previous to *Anno Domini* 1913, but said capital shall, after said year, be located by the electors

of said state at an election to be provided for by the Legislature." The acceptance of the terms of the Enabling Act and this provision was made a prerequisite condition on the part of Congress for the authority mentioned in section 2 of said act, granted to the people concerned, authorizing them to vote for and choose delegates to a Constitutional Convention for the proposed state. This acceptance, then, was, to these people, a fundamental prerequisite condition, without which there would have been no statehood. Congress is vested with absolute authority to admit states, and it may do so upon such terms and conditions as it chooses. The Enabling Act was a proposal on the part of Congress, which on its acceptance and a compliance with its terms · there was pledged to our people statehood. The majority opinion of this court holds that such an irrevocable compact was void, and that the people of the state could not lawfully enter into the same, and that if they attempted to do so they could not be bound thereby, for the reason that it involved the yielding of a portion of their sovereignty which they lacked the power to do. Granting for the sake of this discussion that this is true, and that the compact feature must fall, yet it must be admitted that when the sovereign people of the state read the Enabling Act and understood its meaning, and then elected delegates to attend a convention, that in so far as they could they approved and ratified the same, knowing that one of the acts which the delegates selected by them would be required to do in order to secure and retain the end sought was the approval of the act by the ordinance irrevocable. Therefore, when they selected their delegates and sent them to the Convention, to the extent which they could, which involved all the power they possessed, they empowered them, and made the act of the delegates and the Convention their act. Chief Justice Marshall in the celebrated case of *Marbury v. Madison,* 1 Cranch, 137, 2 L. Ed. 60, said:

"That the people have an original right to establish for their future government such principles as in their opinion shall most conduce to their own happiness, is the basis on which the whole American fabric has been erected."

There is no power in any state superior to the sovereign will of the people, and when that will is expressed and can be understood, it is binding upon every governmental agency established. The Constitution of a state is neither more nor less than law.

Mr. Bryce in his excellent work on the American Commonwealth, vol. 1, p. 436, says:

"A state Constitution is really nothing but a law made directly by the people voting at the polls upon a draft submitted to them. The people of the state when they so vote act as a primary and constituent assembly, just as if they were all summoned to meet in one place like the folkmotes of our Teutonic forefathers, it is only their numbers that prevents them from so meeting in one place, and oblige the vote to be taken in a variety of polling places."

It is true it is the supreme law, but it is only law in the end, and remains extant and demands recognition to the full extent its makers will it. The government established under it is just such as those who ordain it create, and that government has just such authority as those establishing it invest in it, and when the people of the state elected the delegates to the Convention as authorized by the Enabling Act, their instructions to them to accept the terms thereof was an investment of complete and supreme authority from all the people to do for them this act. The purpose of their election and prime duty was to convene and to pass the ordinance irrevocable under which they were authorized to assemble, and with this for a foundation, it was then their duty to write a Constitution. The fact that this condition was onerous or burdensome or one which every elector of the state would have declined to make, had he had his free and untrammeled choice, is not open to assertion, and if it were, it would in no wise change the situation.

The Supreme Court of the United States, in the case of *White v. Hart,* 13 Wall. 646, 20 L. Ed. 685, referring to a provision inserted in the Constitution of Georgia, which it was asserted was not binding upon the state because it was adopted by dictation and coercion, says:

"The state is estopped to assail it upon such an assumption. Upon the same grounds she might deny the validity of her ratification of the constitutional amendments. The action of Congress upon the subject cannot be inquired into. The case is clearly one in which the judicial is bound to follow the action of the political department of the government, and is concluded by it."

Just as in this case, we are bound by it if we can ascertain what it is.

The acceptance of this provision has been variously denominated an "agreement," "contract," or "compact," but it was such a one as the Supreme Court of the United States, in the case last cited, and in the cases of *Newton v. Commissioners,* 100 U. S. 548, 25 L. Ed. 710, and *Green v. Biddle,* 8 Wheat. 1, 5 L. Ed. 547, held to be a governmental subject involving public interests, and that, although as a compact it fell, a legislative act concerning it was necessarily a public law. So that, should the compact or agreement which it was here sought to enter into fall as between the state of Oklahoma and the government of the United States, it remained yet as a law dictated and directed, passed and adopted in accordance with the express mandate of the whole people, and, until abrogated by them in some lawful manner, must be held valid and binding. In accordance with the terms of the act, and in keeping with the command of the people who elected and sent them there, the delegates in convention assembled and passed the ordinance in which it was ordained that they irrevocably accepted the terms and conditions of the act, thus complying with the terms of the commission under which their election was authorized and the Convention held. Thereafter, and in accordance with an ordinance duly passed, provided for in the Enabling Act, the Constitution, the creation of which depended upon the acceptance of the act in question, was submitted to the people and adopted. Thus we see that we have not only the previous authorization of the people of the state for the adoption of the irrevocable ordinance, but we have in substance its subsequent ratification, for in the adoption of the Constitution the people ratified the acts of the

Convention upon which its adoption depended. Here, then, is a double manifestation on the part of the people of their will in reference thereto. The terms of the Constitution, aside from those provided for in the Enabling Act, were unknown to the people of the state prior to their being framed by the Convention, and submitted for adoption, so that the Constitution itself has less evidence of sanction at the hands of the people of the state than had this irrevocable ordinance, for this was not only known when the Convention submitted its work to the people for their adoption or rejection, but it was known that its adoption was the *sine qua non* to any Constitution or any state at the time of the meeting of the people in the districts and the selection of the men to prepare and write the Constitution.

We are told, however, that it must fall as a compact, and that involving a political and governmental subject, and hence sovereignty, that the people of the state could not barter it away for statehood; that they could not as to it irrevocably bind themselves to Congress nor against themselves. Granted; but as we have seen, in the case of *Newton v. Commissioners, supra,* and the other cases cited, it remains with us as a law of some kind. Now, let us see what kind of a law it is. The people of the state ordained as plainly as it was possible for them to do, that it was an irrevocable law. That is, as plainly and as far as they could, they said to each other, the people of the United States, and the world, we will here make a law which, until 1913, we agree we shall be unable to repeal. It shall be to us and to our people irrevocable. It is a plight, a compact, an 'agreement, and we pledge our sovereign will to respect it as such. By doing this we will be permitted by our sister states to relieve ourselves of the conditions under which we have for many years travailed, and enjoy the rights and privileges of the other states of the Union. We will adopt and accept this, and then we shall be permitted to send two Senators and five Representatives to the Congress of the states. We will adopt this, and shall receive as a bounty from the states of the Union, $5,000,000. If we adopt this we shall receive almost un-

told millions in public lands belonging to the people of the Union. These are some of the things which will come to us and our state by its acceptance, and we give our pledge and word to all that we will abide by it.  For the sake of argument, as we have seen, I grant that the irrevocable part of it must fall so far as the people of the state in their sovereign capacity is concerned.  I grant that they did not legally bind themselves.  I grant and yield all of this, but I assert that the people, although unable to bind themselves in the passage and adoption of this act, have intended to and have bound their agencies and every department of government which they established, and have proclaimed that they desired to reserve the right to themselves by their votes to locate their state capital.  And the fact that they limited the power of the Legislature to the calling of the election thereon, reinforces the argument that the people did not intend that body to act finally.  They have done this because they could do it, and because the plain written language of the law which they passed has done it.  On this point Mr. Jameson in his standard work on Constitutional Conventions (4th Ed.) § 351, p. 342, discussing the question as to the extent that the people could be bound by ordinances of a constitutional convention, and speaking of the possibility of the sovereign people to limit or restrict itself, said:

"It (the Convention) may recommend constitutional provisions, which, if adopted and put in force by the sovereign, will bind the latter, so far forth as it can be bound at all, but in that case it would be the sovereign which would limit or restrict itself, not the Convention which would bind it.  And that the sovereign can limit or restrict itself is a well-settled principle.  The bonds, however, by which it can bind itself, are doubtless only moral ones, since under whatever limitations the nation may have placed itself by voluntary regulation, it has evidently at all times the physical ability to disregard them.  In one view, however, these bonds are of immense practical efficacy; it is only the sovereign body which can disrupt them with impunity.  Its servants, the various departments of the government, are obliged to respect them or render themselves obnoxious to punishment for disobedience."

In this case it must be conceded that the sovereign body of the people, while possessing the physical ability to disregard the moral obligations which it has assumed, has done all that it could to bind irrevocably every department that it could bind, and, as is said by Mr. Jameson, its servants and the various departments of government are bound because the sovereign had the power to bind them, and if they ignore it, they thereby render themselves obnoxious to punishment. Nor would this part of the act fall because another element or portion is unconstitutional and un-enforceable, provided the constitutional and unconstitutional provisions are severable and distinct, and the presumption not obtaining that the constitutional portion would not have been adopted had the law-making body foreseen that the balance would have been held invalid. The universal rule on this proposition is laid down in volume 1 of Lewis' Sutherland Statutory Construction (2d Ed.) at section 296, as follows:

"Where a part only of a statute is unconstitutional and therefore void, the remainder may still have effect under certain other conditions. The court is not warranted in declaring the whole statute void unless all the provisions are connected in subject-matter, depend on each other, were designed to operate for the same purpose, or are otherwise so dependent in meaning that it cannot be presumed that the Legislature would have passed one without the other. The constitutional and unconstitutional provisions may even be expressed in the same section, or even in the same sentence, and yet be perfectly distinct and separable, so that the first may stand though the last fall."

It is unnecessary to cite authorities to support a proposition so well established, but the following, among a large number of others cited to support the text, are noted: *Commonwealth v. Hitchings*, 5 Gray (Mass.) 482; *Robinson v. Bidwell et al.*, 22 Cal. 379; *In re Abel*, 10 Idaho, 288, 77 Pac. 621; *People ex rel. v. Kenney et al.*, 96 N. Y. 294. See, also, *In re County Com'rs of Seventh Judicial District*, 22 Okla. 435, 98 Pac. 557.

The Court of Appeals of New York, in the case of *People ex*

rel. v. Kenney et al., supra, in the syllabus laid down the rule as follows:

"The fact that a part of a statute is unconstitutional does not authorize the court to adjudge the remainder void, unless the provisions are so interdependent that one cannot operate without the other, or so related in substance and object that it is impossible to suppose that the Legislature would have passed the one without the other. The question is not whether the good and bad portions are in the same section, but whether they are essentially and inseparably connected in substance. If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must be sustained."

In the present case it is not only not impossible to suppose that the Convention or people would have passed one section or element of this ordinance without the other, but it is impossible to suppose from the nature of the case that they would have done otherwise than they did, had they known and foreseen that they would be held to be unable to bind themselves. Under the plain language of the act, they not only made it irrepealable as to the Legislature and all other of their agencies, but they made it irrevocable as to themselves, which would include all of the subordinate authorities. This being true, and expressing a willingness to bind all the sovereignty, there can be no doubt of their willingness and intention to bind all its parts and all of the agencies to whom they had parceled it. So that, should the act fall as a compact, and should it fall as an irrepealable law as to the people themselves, why are not the portions not unconstitutional still left as a law valid and enforceable against everybody but the people?

It is not contended or insisted that the act of the people in retaining within their own hands the right and power to locate their state capital was void; it is a power which always has existed and is generally dealt with by Constitutional Conventions in organizing a state government, and it is admitted that it is some kind of a law, but assumed to be a statute, and hence subservient

to the will of the Legislature. Viewing it as I do, that it is not to be classed as a statute, I invite attention to the classification in which such laws have usually been placed by law-writers and jurists.

Mr. George F. Tucker, lecturer on International Law in the Boston University School of Law, and author, and who prepared the article on Constitutional Law in Cyc. (8 Cyc. 724), speaking in reference to the ordinances and schedules appended to Constitutions, says:

"Ordinances and schedules appended to 'Constitutions are generally a part of the fundamental law and binding upon all the departments of the state."

Mr. Black in his Law Dictionary, at page 855, defines the word "Ordinance," as follows:

"A rule established by authority; a permanent rule of action; a law or statute. In a more limited sense, the term is used to designate the enactments of the legislative body of a municipal corporation. The name has also been given to certain enactments, more general in their character than ordinary statutes, and serving as organic laws, yet not exactly to be called 'Constitutions.' Such was the 'Ordinance for the government of the northwest territory,' enacted by Congress in 1787."

In this connection, however, I may say that I am rather indifferent to classification and terminology. Lincoln once said, "Suppose we call a dog's tail a leg, how many legs would he have?" To call this act by one name or another will neither raise it nor lower it from the exact standard which it possesses. If it is as to the legislators of the state an irrepealable enactment, then they cannot destroy it. If it is a void or as to them a repealable ordinance, then no obstructions meet them in dealing with it. It was, however, as we have seen, an act of law called an ordinance, authorized and required by act of Congress, and passed on the demand of the people of the state by the Convention, assembled at their behest for the purpose of passing it, and in which it is declared, when reduced to its lowest possible terms, that we reserve unto ourselves the right to deal with this partic-

ular subject. Had the people the right and power, and did they, when they thus spoke, pass the act as a law and make it a part of the fundamental law of the state, and did they accomplish the purpose and the end which they there sought, or may one of their agencies, contrary to their express will, strike it down? The answer to this depends upon the powers of the Convention. Let us therefore investigate them to see if they support the assumptions heretofore indulged. Constitutional Conventions may, with reference to their powers, be divided into two great classes. First, there is the revolutionary or spontaneous convention which arises out of a call by the people. These bodies have at different times assembled to write and adopt Constitutions, and the people acquiescing in them, without submission of their provisions for their adoption or rejection, have enabled their work to pass for the Constitution of the state. These bodies assumed the power to definitely legislate, and their acts stood and were valid because the people acquiesced therein; and no body has ever claimed an ordinary Legislature could repeal them. Then, there is a second class which are conventions called in accordance with law, and these bodies have uniformly possessed just the power to do the things which the law of their being granted them the right and the authority to do. Where they were authorized to frame a Constitution and to submit the same to the people of the state for adoption or rejection, and this was the limit and scope of their authority, any act of theirs not adopted and accepted by the people has very generally been held to be without force or authority, but the acts of these bodies when not required to be submitted, if within the scope of the warrant or law under which they were called, have been complete, final, and binding. Mr. Jameson, at section 367 of his work cited above, says:

"We have seen that both Conventions and Legislatures are agencies appointed by the sovereign for purposes of its own, connected with the formation, the renewal, or the operation of government, the function of each being a legislative one; that to the former are intrusted certain duties relating to the framing of the

*fundamental laws, extending in some cases, according to their com-missions, to the definitive enactment of them."*

Hence, according to the commission of the Convention, it may definitively enact fundamental laws by which the people will be governed; this because the law of their being permitted or requir-ed it. It is to be noted that Mr. Jameson uses the phrase "funda-mental laws," and states that a Constitutional Convention, ac-cording to its commission, may be intrusted with the duty of de-finitely enacting them. There is no question in the minds of any that had the ordinance in question been embodied within our Constitution and made a part of it, the Legislature could not have repealed it. It would have been placed where it would have re-quired a vote of the people to change it. Did not the fact, then, that the Constitutional Convention was empowered with the authority and held a commission authorizing it to definitively and finally pass this, as an irrepealable act, vest it with the power to do so and to make of it, as is termed by Mr. Jameson and other law writers, a "fundamental law"? It is solely a question of power. Out of 157 state Constitutions which has been adopted in whole or in part by the different states of the Union up to the time when Mr. Jameson issued the fourth edition of his book 44 thereof were adopted either under enabling acts of Congress, or acts of the Legislature authorizing the Convention assembled to adopt finally its act or acts as the Constitution for the people whom they served. Their acts were like the acts of this Convention on the ordinance within the terms of the law of their being, and were valid and binding solely because of that fact.

The question now before us was raised in the Supreme Court of Mississippi in the case of *Sproule v. Fredericks,* 69 Miss. 898, 11 South. 472, wherein a part of a Constitution prepared by a state Convention and not submitted to the people, but promulgated as the act of the Convention under legislative authority, was as-sailed on the ground that it had not been submitted to and adopted by the people. Speaking to this question in the case noted, Justice Woods said:

"The validity of the Constitution of 1890 is called into question by counsel for appellee, in a supplemental brief filed recently, by consent of the court, and, as the challenge meets us on the threshold of the case, we proceed at once to its consideration, briefly. In support of this view of the invalidity of the Constitution, two propositions are asserted: (1) A Constitutional Convention has power only to prepare or frame the body of a Constitution, and that when prepared or framed the instrument is of no force or effect until ratified by a popular vote of the people, and the Constitution of 1890, having never been submitted to or ratified by the people, is invalid; and (2) the changes made by the Constitution in the basis of suffrage are violative of the act of Congress readmitting the state of Mississippi into the Union in the year 1870, and invalidate that instrument. With confidence, we reject both propositions as unsound. It will be remembered that the case at bar is free from the difficulties which are supposed by some writers to arise out of a failure or refusal of a Constitutional Convention to yield to the direction of the Legislature which summoned it that the Constitution framed shall be submitted to the people for ratification. The act of the Legislature which provided for the assembling of the Constitutional Convention of 1890 declared that the end sought to be attained, the work to be done, was the revision and amendment of the Constitution of 1869, or the enactment of a new Constitution; and it did not attempt to limit the powers of the Convention by imposing, or seeking to impose, upon that sovereign tribunal the mere legislative will that the Constitution enacted should be submitted to the people for ratification. We have simply the case of a Constitutional Convention enacting a new Constitution, and putting it into effect without an appeal to the people, in strict conformity to the legislative call which assembled it. We have spoken of the Constitutional Convention as a sovereign body, and that characterization perfectly defines the correct view, in our opinion, of the real nature of that august assembly. It is the highest legislative body known to freemen in a representative government. It is supreme in its sphere. It wields the powers of sovereignty, specifically delegated to it for the purpose and the occasion, by the whole electoral body, for the good of the whole commonwealth. The sole limitation upon its powers is that no change in the form of government shall be done or attempted. The spirit of republicanism must breathe through every part of the framework, but the particular fashioning of the

parts of this frame work is confided to the wisdom, the faithfulness, and the patriotism of this great convocation, representing the people in their sovereignty. The theorizing of the political essayist and the legal doctrinaire, by which it is sought to be established that the expression of the will of the Legislature shall fetter and control the Constitution-making body, or, in the absence of such attempted legislative direction, which seeks to teach that the Constitutional Convention can only prepare the frame of a Constitution and recommend it to the people for adoption, will be found to degrade this sovereign body below the level of the lowest tribunal clothed with ordinary legislative powers. This theorizing will reduce that great body, which in our state, at least, since the beginning of its existence, except for a single brief interval, in an exceptional period, by custom and the universal consent of the people, has been regarded as the repository and executor of the powers of sovereignty, to a mere commission, stripped of all power and authorized only to make a recommendation."

To pass this ordinance, then, was within the authority granted to and vested in the Convention, and to say that any authori'y less than the people can repeal it will, as is said by the court from which we last quoted, "degrade this sovereign body" of a Constitutional Convention "below the level of the lowest tribunal clothed with ordinary legislative powers," for this is necessarily involved in the assumption that the act can be repealed by the Legislature. Mr. Jameson at section 103 of his work speaks to the same subject, but with greater particularity upon the definite proposition now before us. He says:

"Besides schedules, there are appended to many Constitutions acts adopted by Conventions, called 'ordinances.' Not all ordinances, however, are so appended, or have any direct relation to Constitutions. They are in their nature resolutions of the bodies adopting them, but taking the name 'ordinances,' to distinguish them from the smilar acts of legislative bodies, denominated 'resolutions,' which may be adopted by the Houses severally or jointly. Within the scope of the powers of a Convention, ordinances may be valid and effectual according to their terms and purpose. If they are employed to provide for temporary emergencies of the Convention, and do not transcend the limits of its powers as:

defined or implied in the act calling it, they are valid. If they are appended to the Constitution, and with it are submitted to the people for adoption or rejection, when submission is not dispensed with, and with it adopted, they are as valid as any part of the Constitution, and are equally binding upon the various departments of the government."

If Mr. Jameson may be considered an authority upon the power which may be lawfully exercised by Constitutional Conventions, and if authority should be deemed necessary for that which appears to be so manifestly self-evident, in the foregoing quotation, we have an absolute expression covering this question. Of the authorized ordinances passed by the Convention, I repeat, "if they are appended to the Constitution, and with it are submitted to the people for adoption or rejection"—now, mark you—*"when submission is not dispensed with,* and with it adopted, they are as valid as any part of the Constitution, and are equally binding upon the various departments of the government." .

This sentence, then, reading it with particular reference to the subject before us, means, as I view it, that if the authorized ordinances are adopted by a Convention with vested authority to adopt, they are as valid as any part of the Constitution, and are equally binding upon the various departments of the government. Some stress seems to be placed on whether the ordinance is appended to the Constitution. We see no force in this. Certainly, the mere clerical act of appending the paper containing the written ordinance to the document would give it no weight it would lack in the absence of this. The question is, did the power exist to adopt it, and was it adopted by the Convention, and not where some clerk of that body placed it. To have appended this ordinance to the Constitution (if it was not done) would not have given it any element it did not have without that act, for it was not intended to be voted on by the people, but to be definitely enacted by the Convention. The certificate of the President of the Convention shows that the ordinance "passed and engrossed, was engrossed with the engrossed copy of the Constitution on parch-

ment, was read as engrossed and roll call had thereon and the same duly authorized by a majority of the votes of all the delegates elected to and constituting this Convention." If a Constitutional Convention may adopt a Constitution for a people because the law calling it together authorizes it to do it, and its acts be final without submission to the people, then there is no reason in logic or law why it cannot do so on less than a Constitution and its act likewise be final. To hold otherwise, as I view it, violates the fundamental principles recognized by every state in the Union; violates the plainest dictates of reason, to say nothing of the authorities which have spoken on the subject.

The ancient case of *Kamper v. Hawkins,* 1 Va. Cas. 20, decided in 1793, contains a discussion of the question which is before us, which, while not involving ordinances of a Convention created as was ours, presents and confirms the views we have here expressed in reference to the binding force of ordinances passed with the intention that they should arise to the dignity of fundamental law. Manifestly, as appears from the case, an attempt had been made, as in this instance, to abrogate by legislative act one of the ordinances passed by the Convention of 1776. The deputies or delegates comprising this Convention were chosen by the people, and the authority given them was "to consult of and take care of their most valuable interests." The Convention thus called established a Bill of Rights and a Constitution which was not submitted to the people for their approval, adoption, or rejection. In the consideration of the question of whether one of the ordinances, so-called, passed by this Convention, was subject to repeal by the Legislature, Judge Nelson, discussing this question, said:

"But it may be objected that, although the Legislature would be bound by a fundamental regulation, made by a convention or other body delegated expressly for such a purpose, the body who formed this, not having been thus specially appointed—this act possesses not sufficient sanctity; but is an act equal only to those of a common Legislature, because some acts passed in the same session are confessedly so. Here let it be remembered that the

question is not whether the people can change it, but whether the Legislature can do so. As to the powers of the Convention, this body seems to have been appointed not only to see that the commonwealth sustained no injury, but also to consult in general for the public good, and in such a crisis as that at which our government was formed, those who are delegated have authority more extensive than a Legislature appointed under a government, one object of which is to restrain that as well as the other departments; whereas in the former case the people alone can decide whether these powers have been strained too far. As to some acts of the same session being temporary and others revocable by the Legislature, I answer that the subject-matter of them will evince which are intended to be of this nature, and if any were designed to be permanent, they must be so until changed by the people, unless, indeed, calling these ordinances and the other a Constitution sufficiently manifests a design that this should· be of a higher authority than those." ·

From the facts of the case and this discussion, it will be seen that, although the ordinance passed by that Convention was not embodied in the Constitution itself, the court in the consideration thereof held, as we have seen, that if it was designed to be permanent, it would be so until changed by the people, unless, as is suggested, the calling of one class of enactments of the Convention "ordinances," and the other, the "Constitution," would manifest a different design. Judge Roane also delivered an opinion for the court. He manifestly classed these so-called ordinances as part of the Constitution, for discussing the question before the court in that case he says:

"This Constitution is sanctioned by the consent and acquiescence of the people; and it is admitted by the most universal opinion of the people, by the repeated adjudications of the courts, and by many declarations of the Legislature itself, to be of superior authority to any opposing act of the Legislature."

Judge Nelson in his discussion seemed to consider that the Legislature would be bound by what he terms "a fundamental regulation made by a convention." This appears, so far as we have been able to discover, the earliest denomination of that class of laws passed by a Constitutional Convention other than either

the election ordinance, the Schedule, or the Constitution itself, as a fundamental regulation or a fundamental law, as these provisions have been called by later text-writers and jurists.

The rule laid down in the foregoing case that the intention of the Constitutional Convention would prevail receives further support in a later case from the Court of Appeals of Virginia—the *Richmond Mayoralty Case,* 19 Grat. (Va.) 673, 712, decided in 1870. This case is approvingly cited and quoted from by the same court in the later case of *Willis et al. v. Kalmbach et al.* (1909) 109 Va. 475, 64 S. E. 342, 21 L. R. A. (N. S.) 1009, from which we extract the following:

"It is true that in the interpretation of all writings words must be construed with reference to their plain and ordinary meaning, and, if possible, every word must be given its due force and effect; but in the effort to give to words their due force, we must not lose sight of other parts of the instrument, but each part must be construed with reference to the whole, so as to make it harmonious and sensible as a whole. As was said by Judge Moncure in the *Richmond Mayoralty Case,* 19 Grat. (Va.) 712: 'The office of a schedule is to provide for a transition from the old to the new government, and to obviate inconveniences which would otherwise arise from such transition.' Elsewhere in the same opin'on it is sa'd that, 'if a Convention in framing the schedule should plainly show an intention to place any of its provisions beyond the control of the Legislature, such provisions, being the act of the representatives of the sovereignty of the state without any constitutional restrictions, would be as effectual and binding as if they were embodied in the Constitution itself.'"

In the case at bar there were not only no constitutional restrictions, but a positive mandate to pass this ordinance, and an intention was plainly shown to place it beyond the reach or control of the Legislature, for the provision is that it shall be irrevocable by even the people themselves.

The phrase applied to ordinances of this character is again placed in the category of "fundamental law" and receives recognition in the case of *Stewart et al. v. Crosby,* 15 Tex. 546, wherein the Supreme Court in the syllabus said:

"We think it free from doubt that the ordinance appended to the Constitution is a part of the fundamental law of the land. Having been framed by the Convention that framed the Constitution of the state, and adopted by the Convention and the people, along with the Constitution, it is of equal authority and binding force upon the executive, legislative, and judicial departments of the government of the state, as if it had been incorporated in the Constitution forming a component part of it."

The ordinance referred to was attached to the Constitution of 1845, and was held, as we have noted, a part of the "fundamental law of the land." The Convention promulgating this Constitution claimed and had no independent legislative authority. The Constitution promulgated was the one under which the republic of Texas was admitted as one of the states of the Union. It will be noted that the ordinance adopted was an ordinance and not a part of the Constitution, but the Convention, lacking independent legislative authority to pass a valid ordinance free of its acceptance by the electors, submitted the same, and, notwithstanding the fact that it was termed an ordinance, it was held to be of equal authority with the Constitution, binding upon the executive, legislative, and judicial departments of the state, as if it had been put into the Constitution and forming a component part thereof. In the case of *Grigsby v. Peak,* 57 Tex. 142, the court passed upon the validity of an ordinance of the Convention of 1866. It does not appear from the opinion itself just what the facts were in regard to the calling of the convention, but in a later case, that of *Quinlan v. Houston & T. C. Ry. Co.,* 89 Tex. 376, 34 S. W. 738, the court stated the same as follows:

"From what has been quoted from the opinion in *Stewart v. Crosby, supra* (15 Tex. 546), it appears that the ordinance then in question was submitted with the Constitution, and voted upon by the people. The Convention which passed the ordinance which was held valid in *Grigsby v. Peak* was called by virtue of the proclamation of President Johnson. This proclamation did not require any part of the work of the Convention to be submitted to the vote of the people, and, in our opinion, that Convention, there-

fore, had the power to pass ordinances without submitting them for adoption to a popular vote."

To make application of this proposition before leaving this point, it is to be noted that in the case at bar the Constitution as a whole was required to be submitted to the people, the ordinance irrevocable was not required to be submitted, the Constitutional Convention was authorized by the act creating it to pass this ordinance; not only was it authorized, but it was required to do so, and the people deliberately elected it for the purpose of doing it, and, in line with the authority just noted, the Convention had the power to pass this ordinance without submitting it for adoption to a popular vote. In the case of *Quinlan v. Houston & T. C. Ry. Co., supra,* the court had under consideration an ordinance passed by the Convention of 1868, which provided for a levy of a tax upon the people of certain counties to aid in the construction of a railway. The court held that the ordinance was not valid by reason of the fact that the Convention which passed it was not authorized to legislate definitively, but was required to submit its acts to the people for their ratification. The Convention in question was provided for by an act of Congress of March 2, 1867; c. 153, 14 Stat. 428, and Act of March 23, 1867, c. 6, 15 Stat. 2. Section 5 of the original act provided for the formation of a Constitution which should be ratified by a majority of the persons voting on the question of ratification. No other authority was granted the Convention except to form a Constitution and submit it to the people. Section 4 of the act last referred to provided *in haec verba:*

. "Said Convention, when organized, shall proceed to frame a Constitution and civil government according to the provisions of this act, and the act to which it is supplementary; and when the same shall have been so framed, said Constitution shall be submitted by the Convention for ratification to the persons registered under the provisions of this act at an election be conducted by the officers or persons appointed or to be appointed by the commanding general, as hereinbefore provided," etc.

The foregoing states the full authority of the Convention,

and it will thus be seen, as contradistinguished from the Enabling Act of 1906, that there was no authority whatsoever granted to this Convention to pass ordinances or acts or constitutional provisions valid in themselves without submission to the people, and any act, ordinance, or provision passed and not submitted, would, in accordance with practically all authority and all reasoning, be without force and without effect. In this case, the court discussing the questions, spoke as follows:

"We are of opinion, however, that the ordinance was not valid. The Convention which met on June 1, 1868, was assembled in pursuance of an act of Congress passed March 23, 1867. It was called for the purpose of framing a Constitution for the state, with a view to its restoration to the Union. The Constitution to be framed by it was to be submitted for ratification to a vote of the people. See Act Cong. March 2, 1867, §§ 3, 4; 2 Paschal's Dig. p. 1093. The act of Congress did not invest the Convention with the power of independent legislation. It is true that the question of the propriety of incorporating any specific provision into the fundamental law was for the sole determination of the Convention. But we are of opinion that, when a Convention is called to frame a Constitution, which is to be submitted to a popular vote for adoption, it cannot pass ordinances, and give them validity, without submitting them to the people for ratification as a part of the Constitution. The delegates to such a Convention are but agents of the people, and are restricted to the exercise of the powers conferred upon them by the law which authorizes their election and assemblage. The ordinance of the Convention in question which divided the state into congressional districts, and that which provided for a submission of the proposed Constitution to a vote of the people, are appended to the Constitution as framed, and the whole is signed by the President and members as one instrument. 2 Paschal's Dig. pp. 1134, 1135. Section 1 of the latter ordinance contains the provision 'that the Constitution adopted by this Convention be submitted for ratification or rejection to the voters of this state,' etc. There is no provision for a submission of the independent ordinances. * * * The Convention which passed the ordinance which was held valid in *Grigsby v. Peak* was called by virtue of the proclamation of President Johnson. This proclamation did not require any part of the

work of the Convention to be submitted to the vote of the people, and, in our opinion, that Convention, therefore, had the power to pass ordinances without submitting them for adoption to a popular vote. The ordinance now under consideration was not submitted to a vote, though two others which were added to, incorporated into, and signed as a part of the Constitution were so submitted. Since the Convention could not finally legislate, and since a vote of the people was necessary to make its action effective, we conclude that the ordinance in question was invalid, and not effective for any purpose."

The distinction which we seek to make here is drawn fully in the preceding discussion. It will be noted that therein the court says that it was of the opinion that "when a Convention is called to frame a Constitution which is to be submitted to a popular vote for adoption, it cannot pass ordinances, and give them validity, without submitting them to the people for ratification as a part of the Constitution." And in reference to the ordinance which was held valid in *Grigsby v. Peak,* it is to be noted that the Convention which passed the same was called by virtue of the proclamation of President Johnson, that this proclamation did not require any part of the work of the Convention to be submitted to the people for ratification, and that therefore the Convention had the power to pass the ordinances in question without submitting them for adoption to a popular vote.

The case of *Plowman v. Thornton,* 52 Ala. 559, involved a consideration of the constitutionality or rather validity of an ordinance passed by the Constitutional Convention of that state in 1867. The powers of the Convention which was called under the reconstruction acts of Congress were special and limited, and it is conceded that it had no legislative power. An ordinance was adopted by the Convention which was in accord with the warrant of its authority putting in operation the governmental agencies which it established. This ordinance was not submitted with the Constitution to the people, and the claim was that it was invalid because not being inserted in the body of the Constitution. Dis-

cussing this question, the Supreme Court of that state, Chief Justice Brickell speaking, said:

"If it had been inserted in the body of the Constitution, its validity would not have been questioned. It is temporary in its character and operation, and seems to us more properly the subject of an ordinance than of incorporation in the body of the Constitution, in which only permanent and enduring provisions should be found."

The case of *Washington v. Washington*, 69 Ala. 281, is one of the extreme cases on the subject, and has probably been departed from, but as it goes farther than is here contended for, it is noted. There was before the court for consideration the validity of an ordinance passed by the Constitutional Convention, not submitted to the people, and not having been embraced within the call of the Convention, and yet Mr. Chief Justice Brickell, speaking for the court, said that "there is no room to doubt the power of the Convention to enact it, and it belongs to a class of legislation which, when employed for such beneficent purposes, deserves the highest judicial consideration." In a still later case, *Ex parte Birmingham & Atl. Ry. Co.*, 145 Ala. 514, 42 South. 118, the Supreme Court recognized the rule for which we contend in this opinion. The Constitutional Convention of Alabama, which assembled by virtue of an act of the Legislature, enacted an ordinance providing for court houses in certain counties. This act provided that the instrument to be promulgated by the Convention should be submitted to the electors for ratification or rejection, with no power of definitive legislation. The ordinance mentioned was not submitted and voted upon by the people, and hence was held void. This for the plain reason that the law under which the Convention was organized did not authorize its passage and adoption by the Convention. The court in the consideration of this question said:

"The act formulating a call of the Convention, and which was voted on by the people, provided only for 'amending and revising' the Constitution, and section 22 also required that the instrument framed should be submitted to the people for ratification or rejection. The people, therefore, in voting for the holding of a con-

vention not only limited the powers of the Convention to the amendment and revision of the Constitution of 1875, but required that its action be submitted back to them. The Convention, realizing the requirements placed thereon by the powers calling it into existence, provided by paragraph 4 of section 287 that the Constitution be submitted to the electors of the state for ratification or rejection, but no provision was made for a submission of the ordinance in question. * * * The Convention, therefore had no right to exercise the authority of the Legislature and adopt the ordinance in question, which was local legislation, pure and simple; and, the adoption of said ordinance being unauthorized, it could not become binding unless ratified by the people."

The Supreme Judicial Court of Massachusetts, speaking as to the authority of the Constitutional Convention in an Opinion to the House of Representatives, 6 Cush. 573, held:

"If the Legislature should submit to the people the expediency of calling a convention of delegates, for the purpose of revising or altering the Constitution of the commonwealth, in any specified part thereof, and the people should, by the terms of their vote, decide to call a convention of delegates, to consider the expediency of so altering the Constitution, the delegates would derive their whole authority and commission from such vote, and would have no right, under the same, to act upon and propose amendments in other parts of the Constitution not so specified."

The Supreme Court of Arkansas in the case of *Bragg v. Tuffts,* 49 Ark. 554, 6 S. W. 158, speaking to the same subject, said:

"Now a convention called, for instance, to frame a new Constitution, has no inherent right to legislate about matters of detail. All of the powers that it possesses are such as have been delegated to it either by express grant or necessary implication."

Discussing the powers of the Constitutional Convention called on the authority of the Legislature, the Court of Appeals of South Carolina in 1834, in the case of *State ex rel. McDaniel v. Mc-Meekin, etc.,* 2 Hill. 1, 270, says:

"The question was made whether the convention which passed the ordinance was not limited by the purpose for which it was assembled; and I am of opinion that it was so limited. And this detracts in no degree from the sovereign character of its act when within that purpose. We have no authority to judge of, revise, or

control any act of the people; but when anything is presented to us as the act of the people, we must of necessity judge and determine whether it be indeed their act. The sole difficulty seems to me to have arisen from confounding together the authority attributed by the Constitution to the people, with that of the Convention. Certainly the Convention was not the people for any other purpose than that for which the people elected and delegated them."

If a convention can be authorized to enact a constitution in its entirety, and proclaim it as the organic law of a state without a submission of the same to the people, there is no argument or authority with which we are acquainted which would deny to it the power, if within its written commission, to enact definitively less than a constitution. If a state conventon may be empowered and can constitutionally enact the whole body of fundamental law of a state and proclaim finally their work as its constitution (a thing which nobody denies can be done), where is the reason, logic, or authority supporting the proposition that a constitutional convention so empowered could not pass and definitively enact less than the entire body of fundamental state law? If a body may do all, why may it not do a part in order to do all? Could the Oklahoma Convention have met, organized, and framed any constitution which could have been lawfully submitted to the people of the state or which would have been subject to and competent to be approved by the President except it first carried out the mandate of the law of its creation and passed, as it did, the ordinance here in question? As the life of the state organized under it and the Constitution itself depended upon the enactment of this ordinance, how can it be said to be of less weight than the Constitution itself? Suppose that the Enabling Act had provided for a constitution enacted and proclaimed by the Convention, and had at the same time provided for submission to the people of the state the question of whether intoxicating liquors might be sold within its borders; will any one assert that the Convention could have definitively passed upon the latter subject? And if the Enab'ing Act, as suggested, had provided for the definitive enactment of a

constitution, but required the submission of the liquor question to the people of the state, will any say that the Constitution would not likewise have been valid and superior to any legislative act? I think not. If consent is yielded to the postulates here presented, can any sound reason, authority, or argument be presented why an enabling act could not have empowered the Convention to do just what was done in this case, the Constitution being submitted to a vote of the people, and the ordinance irrevocable definitively enacted by the Convention? And this being done by a convention called for the purpose of enacting constitutional provisions, and being done within the power of the call, and being done with the intent on the part of Congress, on the part of the people, and on the part of the Convention, that it should be irrevocable—that indeed it should be higher than the provisions of the Constitution itself—is there to be found within the domain of argument or authority any reason why it should not be so declared? But it is asserted that if it was intended to enjoy the exalted position of a constitutional provision, it would have been placed within the body of the Constitution. This very fact, in my judgment, demonstrates incontrovertibly that the same was not intended to be subjected to the control of, or to be dealt with by, the Legislature. There are parts of the Constitution which it is specifically provided the Legislature may after a certain date repeal or amend. There are other provisions which provide for the amendment of the Constitution itself. All Constitutions have provisions for their amendment, and it was known necessarily that this Constitution would likewise contain a provision for its amendment. The ordinance which we have before us was not intended by anybody to be amended or repealed during its intended life, and hence it was designedly placed in a position where it would not fall within the purview of any provisions or enactments providing for repeal or amendment.

It has been supposed by some that the case of *Duke v. Cahawba Navigation Co.*, 10 Ala. 82, 44 Am. Dec. 472, was in

its declarations against the doctrine here asserted. We do not so read the discussion of the propositions involved. By the Constitution in that state the powers of the state government were restricted in particular matters covered by it, and the ordinance referred to was a declaration by the people that certain general powers otherwise appertaining to the state as a sovereignty should not be exercised in particular cases. It provided also that the disclaimer in particular cases, which in the case then before the court involved control over a navigable river, should be irrevocable "without the consent of the United States." The United States granted consent to its revocation, and then the State Legislature, assuming authority to act upon it, enacted the law which was before the court. The question there presented was altogether different from the one here presented. That Convention was organizing a state government, and was vesting just such powers as it desired it to exercise and was restricting it in others that it did not intend it should exercise. In the case then before the court the state government which was being inaugurated was denied the right, "except with the consent of the United States," to deal with that subject. When the United States gave its consent therefor, the Legislature then had authority to deal with it, and the court so held. In the discussion of this proposition the court, speaking through Mr. Justice Goldthwaite, said:

"We think the argument that the ordinance appended to our Constitution is a part of that instrument, and can only be abrogated and annulled in the same manner as any other part, cannot be sustained. By the Constitution, the powers of the state government are restricted in the particular matters covered by it, and the ordinance is the declaration by the people that certain general powers, otherwise appertaining to the state as a sovereignty, shall not be exercised in particular cases. It provides, also, that the disclaimer shall be irrevocable without the consent of the United States. The state government being invested with the entire authority of the people, except where they have chosen to restrict the government, it follows that all the external relations of the people with the citizens of other states or with the government of the United States must be conducted by the state government. The

ordinance itself indicates that it is revocable with the consent of the United States and as the consent of the people of this state can only be expressed through the state government, it follows that when the assent of both is given by the constituted authorities of each the powers disclaimed may be resumed and immediately exercised by the state authorities, under the general powers, these not being restricted otherwise than by the ordinance. As the ordinance is thus revocable by the consent of the United States, it does not seem to admit of material doubt that a consent to a partial abrogation is effectual as a revocation *pro tanto.*"

Moreover the Alabama ordinance was over a subject-matter with which the United States doubtless had plenary authority without an ordinance, and the extent which the people sought to bind themselves was to the point of consent of Congress, and when this was attained, they were no longer bound, for they did not reserve the right to deal with it themselves under an election to be called by the Legislature.

It is insisted that the case of *Frantz v. Autry,* 18 Okla. 561, 91 Pac. 193, is authority for the conclusion which the majority of our Associates have reached. Neither can we so read this, for the reason that the ordinance with which the court in that case was dealing was the temporary election ordinance and not the irrevocable state capital ordinance, and instead of the authority of that case weighing against the position which we have taken, it in fact supports it by showing that those ordinances which are intended to be temporary will be so considered, which marks the distinction between those which are intended and designed to be permanent. The election ordinance for the submission of the Constitution, whether passed by a Legislature or by the Convention itself, under its authority, necessarily passed on being exercised. From its very nature, it could not be used again, because it would deal with conditions entirely in the past after the people had once acted under it. So *Frantz v. Autry* is not contrary to the doctrine here advocated. But it is supposed that section 7 of article 5 of the Constitution, a section found among the

initiative and referendum provisions of that document, vests the Legislature with the authority which is here sought to be sus-.ained. The section reads as follows:

"The reservation of the powers of the initiative and referendum in this article shall not deprive the Legislature of the right to repeal any law, propose or pass any measure, which may be consistent with the Constitution of the state and the Constitution of the United States."

To those familiar with the history of the Convention, it is unnecessary to say that this right to repeal any law, propose or pass any measure vested in the Legislature, was placed therein with no thought whatsoever that it bore the remotest relation to the irrevocable ordinance which the Convention had just enacted, but it was in response to a demand that the government organized within Oklahoma should not be amenable to the charge that it was democratic and not republican in form. The purpose of the section is plainly disclosed by its terms. It simply states in other words that the powers of the initiative and referendum, when exercised by the people, shall not deny to the Legislature the authority to deal with the measures so passed; thus, vesting in the Legislature authority equal to that reserved by the people under the initiative and referendum provisions, the people by the referendum being able to destroy any law passed by the Legislature, and by the initiative enabled to pass any act to which the Legislature denied its assent, the power at all times, however, remaining and abiding with the Legislature to repeal, modify, or amend any such provisions. We submit that this is the extent of the scope of the intent of that section. But if this section carried with it all that is claimed for it, and if it was here intended to grant a general authority to the Legislature to repeal any law, propose or pass any measure not inconsistent with the Constitution of the United States or the Constitution of the state of Oklahoma, even then it would not be sufficiently far-reaching under the common canons to authorize it to repeal the irrevocable ordinance here involved. The law on this matter uniformly recognized by the courts

of the nation is laid down in volume 2, § 346, of Lewis' Suther-
land Statutory Construction, and reads as follows:

"Where there is an act or provision which is general, and ap-
plicable actually or potentially to a multitude of subjects, and
there is also another act or provision which is particular and ap-
plicable to one of these subjects, and inconsistent with the general
act, they are not necessarily so inconsistent that both cannot
stand, though contained in the same act, or though the general law
were an independent enactment. The general act would operate
according to its terms on all the subjects embraced therein, ex-
cept the particular one which is the subject of the special act."

Speaking of implied and recognized exceptions to acts con-
taining general provisions, this court, in the case of *Huston v. Scott*,
20 Okla. 142, 153, 94 Pac. 512, 516, said:

"The foregoing rules constitute well-understood limitations
to the effect of any general law. They are just as much a part
of the act as if written into it. They control it and restrict the
scope of its action to the utmost limit. No Legislature acts ex-
cept within the scope they grant, and no court construes the mean-
ing of any statute presented for consideration, except it recog-
nizes their force and potency. If plaintiff in error's contention
were consistent, and this section permitted to stand alone, repeal-
ing and taking the place of all other laws touching the subject,
and its words are to be given the amplified meaning for which he
contends, let us see into what mazes and difficulties we would be
led: 'All male persons of the age of 21 years, etc., may take title
to, hold, mortgage, convey, and make any contract relating to real
estate or any interest therein.' No exceptions are mentioned with-
in the section, and he contends there are none, and that this sup-
plants all the law on the subject. Section 3612, St. Okla. 1893,
provides: 'After his incapacity has been judicially determined,
a person of unsound mind can make no conveyance or other con-
tract, nor designate any power, nor waive any right, until his
restoration to capacity is judicially determined.' To give the
force contended for by plaintiff in error to the section in ques-
tion would qualify every incompetent 21 years old in the state,
even if his incapacity had been judicially determined, and he was
under the care of a guardian; even though a gibbering imbecile,
incarcerated in a sanitarium, occupying the ward of the incurable.

he would be fully competent, under this construction, to convey his real estate, mortgage it, and deal with it, and the courts, supine and powerless, would witness his exploitation. In addition to that, section 2578, St. Okla. 1893, provides: 'A person sentenced to imprisonment in the territorial prison for life is thereby deemed civilly dead.' The courts hold, under this section, a man in this condition is disqualified from making any deed, mortgage, or other conveyance of his property. Does any one suppose that this section and the preceding one were in the minds of the legislators at the time they passed the conveyancing act in question? And the person upon whom these sections operate, if they be but 21 years of age, permitted to deal to the fullest extent, in their real property? Are they within the scope, purpose, and purview of the act? * * * The foregoing exemplifies the absurd results following a literal construction of the statute as contended for by plaintiff in error, and we escape therefrom only by virtue of the salutary rules herein invoked. The mere statement of the proposition carries refutation with it."

The special act in this case was the ordinance irrevocable dealing specifically and definitely with the location of the state capital, and the general law therefor vesting in the Legislature the power here claimed for it would not, under this rule, authorize it to repeal the special, irrevocable ordinance. The Supreme Court of Missouri in the case of *Edwards v. Lesueur*, 132 Mo. 410, 33 S. W. 1130, 31 L. R. A. 815, which involved an alleged irrevocable agreement, in a case wherein it was claimed that the Constitutional Convention had provided for its repeal, said: "The Convention would hardly have made an irrevocable agreement and immediately proceeded to violate it." We are willing to assert for our own Constitutional Convention a claim equally as high; nay more. We are unwilling to yield the proposition that the men constituting the Convention who framed and submitted the Constitution under which we live ever intended, after they had adopted the ordinance irrevocable, to vest the Legislature with the authority to repeal it. Such a conclusion is to our mind impossible. Nor do we believe, nor will we consent, that the people of the state, when they adopted the Constitution, ever intended

that the pledge which was made, and the fundamental law which they passed in the irrevocable ordinance, should or could be violated by any Leg'slature.  But we believe, and we love to think, that when the Convention and the people enacted this ordinance, they did so with the honest intent that it should be carried out in good faith; and if it was so enacted, then our Legislature manifestly lacked the authority to repeal it.  Because the act was not valid as an irrevocable ordinance as to the people, the majority of the court have fallen into the error in reference to the real substance of the act, to wit, in holding that the location of the capital, which was reserved by the people to be voted on by themselves at an election to be called by the Legislature, must also fall. It is held that because, forsooth, the people declared that no one shall act on this prior to 1913—and this cannot stand—then any one, or at least the Legislature, may act on it prior to that date; that the Legislature which could act only by calling an election after 1913 could, because the 1913 provision falls, act with plenary power prior to that date and locate the capital, the right to do which the people sought to reserve irrevocably to themselves. Let us reform the ordinance as it reads under the view in which we seek to present it, stripped as it is by the court of the irrevocable and the compact elements.  It would then read:  Be it ordained by the Constitutional Convention for the proposed state of Oklahoma, that said Constitutional Convention do by this ordinance, irrevocable by the Legislature, accept the terms of the Enabling Act, providing that the capital of said state shall be in the city of Guthrie in the present territory of Oklahoma, and shall not be changed therefrom except it may be located by the electors of said state at an election to be provided for by the Legislature after 1913.  Did not the people say—and lawfully say, and with full power to say—just that?  Prior to 1913 the irrevocable feature falling, the people could locate it—how, it is not necessary to inquire—but they have bound the hands of the Legislature in reference thereto by specifically setting out its powers.  And the expression of this definite authority certainly excludes the exercise

of any other. As was said by the Supreme Court of Rhode Island in an opinion to the Legislature, *In re Constitutional Convention,* 14 R. I. 651:

"We are of opinion that the mode provided in the Constitution for the amendment thereof is the only mode in which it can be constitutionally amended. The ordinary rule is that where power is given to do a thing in a particular way, there, the affirmative words, marking out the particular way, prohibit all other ways by implication, so that the particular way is the only way in which the power can be legally executed. The rule was recently recognized by the Supreme Court of the United States in *Smith v. Stephens,* 10 Wall. 321 [19 L. Ed. 933]. There, by act of Congress, lands were ceded to Indians with power to sell them, or parts of them, in a particular manner, and the court held that a sale in any other manner was void. The rule was likewise recently recognized by the English Court of Exchequer in a case in which it was thus expressed: 'If authority is given expressly, though by affirmative words, upon a defined condition, the expression of that condition excludes the doing of the act authorized under other circumstances than those so defined: *"Expressio unius est exclusio alterius."' North Stafford Steel, etc., Co. v. Ward,* L. R. 3 Exch. 172, 177. Cases to the same point might be indefinitely multiplied. 1 Kent, Com. 467, note d; 1 Sugden on Powers, 258 *et seq.; City of New Haven v. Whitney,* 36 Conn. 373; *District Township of City of Dubuque v. City of Dubuque,* 7 Iowa, 262. * * * Our Constitution is, by its own express declaration, the supreme law of the state; any law inconsistent with it is void, and therefore, if the provision which it contains for its own amendment is exclusive, implying a prohibition of amendments in any other manner, then, of course, any act of the Assembly providing for a convention to amend the Constitution is unconstitutional and void."

We have pressed upon our Associates the foregoing arguments with all the vigor which we possess. That they were logical and expressed the law on the subject involved appeared to us to be irrefutable, but we have been unable to secure the assent of a majority thereto.

At the conclusion of the debates of the federal Constitutional Convention, as the body was about to sign the document and disperse, Benjamin Franklin, then silvered and palsied with age, prob-

ably one of the wisest men our nation has ever produced, stood in his place and asserting that he did not entirely approve the Constitution, said:

"I am not sure I shall never approve it; for, having lived long, I have experienced many instances of being obliged by better information or fuller consideration, to change my opinions even on important subjects, which I once thought right, but found to be otherwise."

An exalted regard for the opinion of my Associates who do not agree with me herein has caused some little trepidation on my part over the submission in writing the conclusions to which I have here come. But if what I have said on this great and important historical occasion has not met the sanction of a majority of the court, it will at least have the merit of preserving, though in a crude and hastily prepared form, my own and in part the views of my brother KANE, along with those eminent counsel who have assiduously and in good faith diligently labored to aid this court in arriving at a just and legal conclusion.

In the conclusion here reached, I am authorized to say Mr. Justice KANE concurs.

———————

KANE, J. (dissenting). In the case of *Thos. P. Smith, Secretary of State, et al., Plaintiffs in Error, v. State ex rel. Hepburn, Defendant in Error, infra,* 113 Pac. 932, I based my concurrence in the conclusion reached by the court upon the ground that upon the acceptance of the terms and conditions of the Enabling Act by the Constitutional Convention by ordinance irrevocable, that part thereof which provides that, "the capital of said state shall temporarily be at the city of Guthrie, in the present territory of Oklahoma, and shall not be changed therefrom previous to *Anno Domini* nineteen hundred and thirteen, but said capital shall after said year be located by the electors of said state at an election to be provided for by the Legislature: Provided, however, that the Legislature of said state, except as shall be necessary for the con-

venient transaction of the public business of said state at said capital, shall not appropriate any public moneys of the state for the erection of buildings for capital purposes during such period," was entitled to the force and effect of a compact between the United States and the people of the proposed state which can be rescinded only by common assent of those who were parties thereto. In the present case I dissent from the opinion of the majority of the court upon the same ground. I have such a high regard for the opinion of my Brothers that it is with hesitation I differ from their judgment, and I doubt that I would have the temerity to do so if it did not appear perfectly clear to me that their opinion in the instant case runs counter to a principle of law which has been sanctioned by the legislative departments of the state and federal governments of this republic ever since its creation, and upheld with practical unanimity by the courts, state and federal, in the comparatively few cases wherein it has been questioned.

Without reviewing generally the powers of a Constitutional Convention to bind the people of a proposed state by accepting the terms of its Enabling Act, we find the power of the Convention whose act is now under consideration very fully, and I think correctly, defined in *Frantz et al. v. Autry,* 18 Okla. 561, 91 Pac. 193, wherein it is said:

"The delegates to the Convention were not the agents or representatives of Congress, but they were the immediate agents and representatives of the people of the two territories. They derived their power and authority from the people in their sovereign capacity."

Speaking of the power of the Convention, Mr. Justice Hainer, who delivered the opinion of the court, continues:

"The Convention has and can exercise plenary powers subject to the limitations: (1) That the Constitution shall be republican in form; (2) that it shall not be repugnant to the Constitution of the United States and the principles of the Declaration of Independence; (3) that no distinction shall be made on account of race or color; and (4) that the Convention shall ac-

cept by ordinance irrevocable all the terms and conditions of the Enabling Act."

In discussing the power of Congress in that regard, the learned justice says:

"It is true that Congress has the power to impose conditions upon a territory as a condition precedent to entitle it to admission as a state."

The opinion in that case decides three questions preliminary to the questions herein involved: (1) The source of the power of the Constitutional Convention to act for the people; (2) that the Convention had the power to accept the terms of the Enabling Act; and (3) that Congress had the power to impose conditions upon the people of the proposed state precedent to its admission. The questions which remain are: (1) Was the provision of the Enabling Act involved herein a proper subject for compact? (2) If it was not, is the action of the Constitutional Convention in relation thereto entitled to the force and effect of a fundamental law, or does it stand upon the footing of an ordinary statutory law repealable at the will of the Legislature? None of the members of the court takes the position that it was a void and futile act; so as far as this case is concerned, it is entitled to the status of (1) a compact; (2) a fundamental law; or (3) an ordinary statutory law repealable at the will of the Legislature.

It seems to me that after rejecting the theory that it was a void and useless act, the only logical conclusion left is that it constitutes a compact, and that there can be but one answer to the question, "Is the provision of the Enabling Act in relation to the temporary location of the capital a proper subject of compact between the United States and the people of the proposed state?" That the Constitutional Convention had the power to bind the people of the state in that respect by fundamental law there can be no question. I cannot understand why it could not do the same by following the directions of the mandate that called it into existence. As far as the acceptance of this particular provision of the Enabling Act is concerned, the action of the Constitutional Convention is as fully ratified and affirmed by the people as if it

had been written into the Constitution. When the delegates were elected the people had full knowledge of the proposals contained in the Enabling Act, and that as the price of statehood it would be necessary to accept some of them by ordinance irrevocable, whilst others must be incorporated in the Constitution. Afterwards the action of the Convention in that regard was again ratified by the people when they adopted the Constitution with full knowledge of the action of the Constitutional Convention, and again by accepting statehood after the President issued his proclamation wherein it was reiterated that the terms of the Enabling Act had been fully complied with.

In the case of *Hogg v. Zanesville Canal & Mfg. Co.*, 5 Ohio, 410, the point was before the court as to the effect to be given to an irrevocable condition precedent to admission as a state. The Enabling Act of the state of Ohio was adopted by ordinance irrevocable the same as certain conditions named in the Enabling Act were adopted by the people of Oklahoma, and it was suggested in that case, as in this, that it being no part of the Constitution, the people of the state might change it, and, in response to this, the court said:

"This portion of the ordinance of 1787 is as much obligatory upon the state of Ohio as our own Constitution. In truth, it is more; for the Constitution may be altered by the people of the state, while this cannot be altered without the assent both of the people of this state and of the United States through their representatives. It is an article of compact, and until we assume the principle that the sovereign power of the state is not bound by compact, this clause must be considered obligatory."

In *Higgins v. Brown, Judge, et al.*, 20 Okla. 355, 94 Pac. 703, and several other cases, this court recognizes the soundness of the rule laid down in the Autry case, and further holds that at least one of the subjects embraced within the Enabling Act was a proper subject of compact, and that its acceptance by the Convention transferred legislative power to the state which, in the absence of such compact, belonged to the United States. The question in *Higgins v. Brown, supra,* was whether or not Congress, with

the concurrence of the state, could provide that the state courts as successors of the territorial courts, could proceed to final determination or render final judgment in criminal cases not of a federal character, pending and not finally disposed of in the district courts of the territory of Oklahoma or in the United States courts of the Indian Territory. It was held that:

"Sections 16 and 20, inclusive, of the Enabling Act for Oklahoma, Act June 16, 1906, c. 3335, 34 Stat, 276, 277, as amended March 4, 1907, c. 2911, 34 Stat. 1286, 1287, when concurred in by the state of Oklahoma by the adoption of sections 27 and 28 of the Schedule to the Constitution, being a proper exercise of power by the Congress under article 4, § 3, of the Constitution of the United States, are valid."

Mr. Chief Justice Williams, who delivered the opinion of the court, after an exhaustive review of the Enabling Acts of the several states admitted to statehood prior to Oklahoma, and the decisions bearing upon the question then under discussion, said:

"In the cases of West Virginia, Nevada, Nebraska, Colorado, North and South Dakota, Montana and Washington, Utah and Oklahoma, these states have been admitted by proclamation of the President of the United States, pursuant to the provisions of the Enabling Acts, and Wyoming and Idaho were admitted after they had formed Constitutions, not under an Enabling Act, but by act of Congress. We find that in all the states that were admitted by an act of Congress, and not by proclamation of the President, the state courts, with provisions in the Schedules of their Constitutions permitting such jurisdiction, have exercised the same in cases like the one at bar, and why should the state courts of Oklahoma likewise not exercise like jurisdiction? It undoubtedly is in accordance with the rule laid down in *Benner v. Porter*, 9 How. 235, 13 L. Ed. 119, being necessary for the Congress to concur in order for the jurisdiction to attach to the state courts. And unquestionably where a state had formed a Constitution and provided therein that the state courts should become the successors of like courts under the territorial form of government, and that as to criminal cases, not of a federal nature, the same should be prosecuted to final judgment in such court; that when Congress admitted such a state into the Union with such a provision in its Constitution it expressly concurred in and agreed to such provision.

In the case of West Virginia, Nevada. Colorado, North and South Dakota, Montana, Washington, Utah, and Oklahoma, where the Constitutions were formed under an Enabling Act, and by virtue of that Enabling Act a proclamation was issued by the President of the United States admitting such state or states into the Union under the Constitution thus formed containing like provisions in like manner, did not the federal government concur in such provisions in like manner as if such states had been admitted directly by act of Congress? Should it be urged by counsel that the President had no such constitutional authority, he would be contending for a proposition that would be tantamount to declaring that Oklahoma was not legally in the Union of states. This court certainly will not make such a declaration—will not repudiate the power that brought it into active existence."

The case of *Higgins v. Brown, supra,* was followed in *Ex parte Curlee,* 20 Okla. 192, 95 Pac. 414; *Ex parte Bailey,* 20 Okla. 497, 94 Pac. 553; *Ex parte Brown,* 20 Okla. 505, 94 Pac. 556; *Ex parte Buchanen,* 20 Okla. 831, 94 Pac. 943. In *Ex parte Bailey, supra,* after citing section 4 of the Enabling Act, which provides, "And if the Constitution and government of said proposed state are republican in form, and if the provisions of this act have been complied with in the formation thereof, it shall be the duty of the President of the United States. within twenty days from the receipt of the certificate of the results of said election and the statement of the votes cast thereon and a copy of said Constitution, articles, propositions and ordinances, to issue his proclamation announcing the result of said election; and thereupon the proposed state of Oklahoma shall be deemed admitted by Congress into the Union, under and by virtue of this act, on an equal footing with the original states," Mr. Chief Justice Williams continues:

"The only limitation is that the Constitution and state government shall be 'republican in form' and comply with the provisions of said act. All other provisions which the Constitutional Convention had the power to insert by reasonable implication are permitted and concurred in, the act of the President consummating the same."

It seems to be well settled that whether a proposed state shall be admitted and whether its government is republican in form are political questions which must be settled by Congress and the people of the proposed state, because Congress alone is vested with the power to admit new states and charged with the duty to guarantee a republican form of government, whilst the people have the power to accept or reject the proposals of Congress. *Luther v. Borden et al.,* 7 How. 1, 12 L. Ed. 581; *Martin v. Mott,* 12 Wheat. 19, 6 L. Ed. 537; *Wilkes v. Dinsman,* 7 How. 89, 12 L. Ed. 618; *Oklahoma City v. Shields,* 22 Okla. 265, 100 Pac. 559; *In re Day et al.* (C. C.) 27 Fed. 678; *Rubber Company v. Goodyear,* 9 Wall. 788, 19 L. Ed. 566; *Japanese Immigrant Case,* 189 U. S. 86, 23 Sup. Ct. 611, 47 L. Ed. 721; *Looe Shee v. North,* 170 Fed. 570, 95 C. C. A. 646; *Gibbons v. Ogden,* 9 Wheat. 1, 6 L. Ed. 23; *Martin v. Hunter,* 1 Wheat. 304, 4 L. Ed. 97; *Prigg v. Commonwealth of Pennsylvania,* 16 Pet. 539, 10 L. Ed. 1060; *State v. Harris,* 2 Bailey (S. C.) 598.

The case of *Benner et al. v. Porter,* cited by the learned Chief Justice in the Higgins case, *supra,* arose out of the failure of Congress to make proper provision for the transfer of cases pending in the territory of Florida upon its admission into the Union as a state. Upon this question, Mr. Justice Nelson, who delivered the opinion for the court, said:

"On the admission of a territorial government into the Union as a state, the concurrence of both the federal and state governments would seem to be required in the transfer of the records, in cases of appropriate state jurisdiction, from the old to the new government. An act of Congress would be incapable of passing them under the state jurisdiction, as would be an act of the Legislature of the state to take the records out of the custody of the federal government. Both should concur. The like concurrent legislation would also seem to be required in respect to cases pending in this court for review on writs of error or appeal from the territorial courts, which appropriately belonged to state jurisdiction, to enable us to send down the mandate to the proper

state tribunal for any further proceedings that might be necessary in the case."

Speaking of the duty of Congress in this regard, Mr. Justice Nelson continues:

"It is to be regretted that proper provision had not always been made by Congress, upon a change of government, in respect to the pending business in the territorial tribunals, so as to remove all embarrassment and perplexity on the subject. * * * A very slight attention to the subject by Congress, at the time, would remove all the difficulties that have occurred in several of the states recently admitted."

Under its power to admit new states into the Union and its duty to guarantee to every state a republican form of government, Congress, for more than a century, has exercised the power of framing enabling acts providing for the erection of new states, containing propositions which the people were required to accept as condition precedent to admission. It has been held that contemporary interpretations of the Constitution, practiced and acquiesced in for years, fixes its construction (*Stuart v. Laird,* 1 Cranch, 299; 2 L. Ed. 115; *Martin v. Hunter,* 1 Wheat, 304, 4 L. Ed. 97; *Bridge Co. v. Dix,* 6 How. 507, 12 L. Ed. 535), and this rule was given proper weight in *Higgins v. Brown, supra.* There is room for the application of the rule in the case at bar. Most of these propositions, if not all of them, consist of grants of legislative authority to the federal government or waivers of the exercise of some function of government by the state, usually for a limited time. These concessions or waivers have been treated by the courts as compacts and not as involuntary exactions forced upon the people by the federal government. *While v. Hart,* 13 Wall. 646, 20 L. Ed. 685, illustrates this proposition. In that case it was held that:

"The Constitution adopted by Georgia, A. D. 1868 [article 5, § 17] by which it was provided that, 'no court or officer shall have, nor shall the General Assembly give, jurisdiction to try, or give judgment on, or enforce any debt, the consideration of which was a slave, or the hire thereof,' is to be regarded by the court as

voluntarily adopted by the state named, and not as adopted under any dictation and coercion of Congress. Congress having received and recognized the said Constitution as the voluntary and valid offering of the state of Georgia, this court is concluded by such action of the political department of the government."

These compacts between the sovereign people and the .federal government have embraced a wide range of subjects, but they all have this essential quality in common—the subjects treated would have been rightful subjects of legislation by the state or government that relinquished them, if the compact had not been entered into. Some of the most common subjects embraced within such compacts are agreements not to require any religious test as a qualification for holding office; that no plural marriages shall be permitted; that the land of nonresidents shall not be taxed at a higher rate than the lands belonging to residents; not to claim any interest in the public or waste lands belonging to the United States; that judicial proceedings shall be carried on in the English language; that navigable waters shall be free to all persons, etc. Besides the foregoing class of compacts beween the federal government and the people of a proposed state, compacts between states concerning governmental affairs have been very common. The history of the earliest attempts of the states to form a Union discloses that each claimed and exercised the right to make its own compacts, surrendering as much or little of its sovereignty to the federal government as in its judgment seemed proper, and this right has been uniformly upheld by the courts. In *Ft. Leavenworth R. Co. v. Lowe*, 114 U. S. 525, 5 Sup Ct. 995, 29 L. Ed. 264, wherein a compact between Kansas and the United States concerning a military reservation was upheld, Mr. Justice Field, in speaking of the relation of the states to the federal government, said:

"In their relation to the general government, the states of the Union stand in a very different position from that which they hold to foreign governments. Though the jurisdiction and authority of the general government are essentially different from those of the state, they are not those of a different country, and

the two, the state and general government, may deal with each other in any way they may deem best to carry out the purposes of the Constitution. It is for the protection and interests of the states, their people and property, as well as for the protection and interests of the people generally of the United States, that forts, arsenals, and other buildings for public uses are constructed within the states. As instrumentalities for the execution of the powers of the general government, they are, as already said, exempt from such control of the United States as would defeat or impair their use for those purposes; and if, to their more effective use, a cession of legislative authority and political jurisdiction by the state would be desirable, we do not perceive any objection to its grant by the Legislature of the state. Such cession is really as much for the benefit of the state as it is for the benefit of the United States. It is necessarily temporary, to be exercised only so long as the places continue to be used for the public purposes for which the property was acquired or reserved from sale. When they cease to be thus used, the jurisdiction reverts to the state."

And in dealing with each other it does not appear to have made any difference whether the question involved pertains to a political or property right. Most of these compacts deal with the political features of the subjects embraced within their purview, and consist of limitations upon the power to legislate upon the subjects mentioned; no property rights existing between the contracting sovereignties being directly involved. The question of property rights usually arose by some citizen or taxpayer contending that his rights in that respect would be affected by the enforcement or violation of the compact as the case might be, and in that particular this case is similar to the rest.

*Spooner v. McConnell*, 22 Fed. Cas. 939, contains an interesting discussion of the general question now under consideration, and Mr. Justice McLean, who delivered the opinion, satisfactorily answers the contention that to give to the provision of the Enabling Act under discussion and its acceptance the force and effect of a compact would be restrictive of the sovereign power of the state, as follows:

"It is a well-established principle that no political change in a government annuls a compact made with another sovereign power or with individuals. The compact is protected by that sacred regard for plighted faith, which should be cherished alike by individuals and organized communities. A disregard of this great principle would reject all the lights and advantages of civilization, and throw us back on the age of vandalism. This compact was formed between political communities and the future inhabitants of a rising territory, and the states which should be formed within it. And all who became inhabitants of the territory made themselves parties to the compact. And this compact so formed could only be rescinded by the common assent of those who were parties to it. When application was made to Congress by the people of the eastern part of the territory, to authorize the call of a Convention to form a Constitution, modifications of certain provisions of the compact were proposed, some of which were embodied in the Constitution subsequently formed, and others of them, after various alterations, were also inserted. But that provision of the compact which declared that the navigable waters falling into the St. Lawrence and the Mississippi, and the carrying places between them shall be common highways and forever free, etc., was not proposed to be modified.   *   *   * The state has been admitted into the Union on an equal footing with the original states. And yet the state is bound by compact not to tax the lands of the United States, nor until the expiration of five years after they shall have been sold. The power to tax is an incident to sovereignty. Does this exemption take away or lessen this power? If it does, in the sense contended, then the state of Ohio was not admitted into the Union with the same powers of sovereignty as the original states. This consequence is not obviated by the fact that this was a restriction imposed, with the consent of the state, for an equivalent. It be an abridgment of the sovereign power of the state, the objection stands in its full force. The compact not to tax was the voluntary act of the people of the state, but not more so than was the compact by the same people that the navigable waters should be common highways. And this exemption from taxation is as much a restriction on the exercise of the sovereign power, as the exemption of the navigable streams from obstruction by the same power. *   *   * The terms 'sovereign power of a state' are often used without any very definite idea of their meaning, and they are

often misapplied. Prior to the formation of the federal Constitution, the states were sovereign in the absolute sense of the term. They had established a certain agency, under the Article of Confederation, but this agency had little or no power beyond that of recommending to the states the adoption of certain measures. It could not be properly denominated a government, as it did not possess the power of carrying its acts into effect. The people of the states by the adoption of the federal Constitution imposed certain limitations in the exercise of their powers which appertain to sovereignty. But the states are still sovereign. They are bound by the compact not to exercise certain powers which they have delegated to the federal government, and the citizens of the state are bound to respect and obey the powers thus delegated. But this compact, or federal Constitution, was voluntarily formed by the people of the states, in their sovereign capacity, and may be changed, at their pleasure, in the mode provided. The sovereignty of a state does not reside in the persons who fill the different departments of its government, but in the people from whom the government emanated, and who may change it at their discretion. Sovereignty, then, in this country, abides with the constituency and not with the agent. And this remark is true both in reference to the federal and state governments. If the people of a state, in their sovereign capacity, enter into a compact, either from motives of sound policy or for a valuable consideration paid, that certain lands within the state shall be exempt from taxation, or that certain navigable rivers shall remain unobstructed, the sovereignty of the state is no more affected than it is by every act of incorporation, where exclusive privileges are given to a company or an individual. Certain objects on which the sovereign power may act are, by its own consent, withdrawn from its action; but this does not divest the state of any attribute of its sovereignty. If certain lands be exempt from taxation, the general power to tax is not affected; and so as to any exclusive right or privilege which is vested by compact or act of incorporation. A state cannot divest itself of its essential attributes of sovereignty. It cannot enter into a compact not to exercise its legislative and judicial functions, or its elective rights; because this would be to change the form of government which is guaranteed by the federal Constitution. But it is earnestly contended that the rights asserted by the complainant, are wholly incompatible with the sovereignty of the state, and with the provision that the state

was admitted on an equal footing with the original states. Does this provision mean that the new state shall exercise the same powers and in the same modes, as are exercised by any other state? Now this cannot be the true construction of the provision, for there cannot be found, perhaps, any two states in the Union whose legislative, judicial, and executive powers are in every respect al.ke. If the argument be sound that there is no equal footing short of exact equality in this respect, then the states are not equal. But if the meaning be that the people of the new state, exercising the sovereign powers which belong to the people of any other state, shall be admitted into the Union, subject to such provisions in their fundamental law as they shall have sanctioned, within the restrictions of the federal Constitution, then the states are equal—equal in rank, equal in their powers of sovereignty; and only differ ,in their restrictions, wh¹ch, in the exercise of those powers, they may have voluntarily imposed upon themselves. Thus a state may, in her Constitution, prohibit the Legislature from incorporating banks, or in fact from passing any act of incorporation; and yet this state would be admitted into the Union on an equal footing with the other states. The same powers were exercised in forming a Constitution, but in the distribution of the powers of the state government they were not given to the same extent, nor were they to be exercised in the same manner. But this produces no inequality. The states are equal, inasmuch as each has, by its own voluntary will, established its own government, and has the power to alter it. This is the principle on which the state governments are established, and consequently they all stand upon an equal footing. They have the same basis; have been formed according to the will of the people, and may be changed at their discretion. If then, there is nothing in the Constitution of the state which is repugnant to the compact in the ordinance in relation to navigable waters, and the parties to the compact have in no form annulled it, and it is not inconsistent with that equality which the state of Ohio claims with the original states. it follows that this compact is in full force, and is a subject of judicial cognizance."

In *Green v. Biddle,* 8 Wheat. 1, 5 L. Ed. 547, an occupying claimant's act passed by the Legislature of the state of Kentucky was held to be invalid upon the ground that it was in violation of

Vol. 28—15.

the compact between the states of Virginia and Kentucky contained in the act of the Legislature of Virginia of December 18, 1789, and ratified by the Convention which framed the Constitution of Kentucky, and included in the Constitution of that state as one of its fundamental articles. Both parties to the suit claimed title to the land in controversy under patents from the state of Virginia prior to the erection of the district of Kentucky into a state. The compact was to the effect that all private rights and interests in the land within said district of Kentucky derived from the law of Virginia prior to such separation shall remain inviolate and secure under the laws of the proposed state, and shall be determined by the laws now existing in this state (Virginia). The occupying claimant's act passed by the Legislature of Kentucky materially changed the private rights and interests of the parties in the lands in controversy, as they existed under the laws of the state of Virginia, contrary to the terms of the compact. The case was twice before the court. On the first submission the opinion was prepared by Mr. Justice Story, and on rehearing by Mr. Justice Washington; present, Mr. Chief Justice Marshall, and Justices Johnson, Livingston, Todd, Duvall, and Story. Both opinions upheld the compact. On the first hearing there was no appearance or brief on behalf of one of the parties but on rehearing Henry Clay appeared as *amicus curiae*. Mr. Clay contended that the limitations imposed by the compact upon the state of Kentucky were not of a character which said state was bound to respect, for the reason that the state of Kentucky in its sovereign capacity could not be bound by the compact, as it required it to surrender part of its sovereignty. Discussing this contention, Mr. Justice Washington said:

"The next objection, which is to the validity of the particular clause of the compact involved in this controversy, rests upon a principle, the correctness of which remains to be proved. It is practically opposed by the theory of all limited governments, and especially of those which constitute this Union. The powers of legislation granted to the government of the United States, as

well as to the several state governments, by their respective Constitutions, are all limited.    The article of the Constitution of the United States, involved in this very case, is one amongst many others, of the restriction alluded to.    If it be answered that these limitations were imposed by the people in their sovereign character, it may be asked, was not the acceptance of the compact the act of the people of Kentucky in their sovereign character? If, then, the principle contended for be a sound one, we can only say that it is one of a most alarming nature, but which, it is believed, cannot be seriously entertained by any American statesman or jurist.    Various objections were made to the literal construction of the compact, one only of which we deem it necessary particularly to notice.    That was that if it be so construed as to deny to the Legislature of Kentucky the right to pass the act in question, it will follow that that state cannot pass laws to affect lands, the title to which was derived under Virginia, although the same should be wanted for public use.    If such a consequence grows necessarily out of this provision of the compact, still we can perceive no reason why the assent to it by the people of Kentucky should not be binding on the Legislature of that state.    Nor can we perceive why the admission of the conclusion involved in the argument should invalidate an express article of the compact in relation to a quite different subject.    The agreement, that the rights of claimants under Virginia should remain as valid and secure as they were under the laws of that state, contains a plain, intelligible proposition, about the meaning of which it is impossible there can be two opinions.    Can the government of Kentucky fly from this agreement, acceded to by the people in their sovereign capacity, because it involves a principle which might be inconvenient, or even pernicious to the state, in some other respect?    The court cannot perceive how this proposition could be maintained."

The decision in that case is planted squarely upon the ground that the agreement between Virginia and Kentucky was inviolate, because it constituted a compact between the two states, and Kentucky could not abrogate it by legislative enactment, or by amending her Constitution, because it was a compact acceded to by her people in their sovereign capacity, which could only be rescinded by the common assent of those who were parties to it.    That

Mr. Justice Story, who sat in the case and who attained great fame as a jurist and as a writer on the Constitution, so understood the principle therein enunciated, and that it might be applied to merely political questions, is apparent from the following, taken from his commentaries on the Constitution (volume 2, § 1321) :

"At the time when the preliminary measures were taken for the admission of the state of Missouri into the Union, an attempt was made to include a restriction prohibiting the introduction of slavery into that state, as a condition of the admission. On that occasion the question was largely discussed whether Congress possessed constitutional authority to impose such a restriction upon the ground that the prescribing of such a condition is inconsistent with the sovereignty of the state to be admitted, and its equality with the other states.    The final result of the vote which authorized the erection of that state seems to establish the rightful authority of Congress to impose such a restriction, although it was not then applied.    In the act passed for this purpose, there is an express clause that in all the territory ceded by France to the United States under the name of Louisiana, which lies north of 36 degrees, 30 min. N. Lat., not included within the limits of the state of Missouri, slavery and involuntary servitude otherwise than in the punishment of crimes, whereof the parties shall have been duly convicted, shall be, and is hereby, forever prohibited.    An objection of a similar character was taken to the compact between Virginia and Kentucky, upon the ground that it was a restriction upon state sovereignty.    But the Supreme Court had no hesitation in overruling it, considering it as opposed by the theory of all free governments, and especially of those which constitute the American Republic."

In the case of *Blue Jacket, for Himself and Other Members of the United Tribe of Shawnee Indians, Residing in Kansas, v. Board of Commissioners of County of Johnson,* 5 Wall. 737, 18 L. Ed. 667, the question involved was the right of the state of Kansas to tax the lands belonging to the United Tribe of Shawnee Indians residing in that state, notwithstanding the compact between the state and the United States to the contrary.    The state contended that this compact impinged upon its sovereignty.    Mr. Justice Davis, who delivered the opinion of the court, said:

"There can be no question of state sovereignty in the case, as Kansas accepted her admission into the family of states on condition that the Indian rights should remain unimpaired and the general government at liberty to make any regulation respecting them, their lands, property, or other rights, which it would have been competent to make if Kansas had not been admitted into the Union."

In *Virginia v. West Virginia*, 11 Wall. 39, 20 L. Ed. 67, a compact involving a boundary question between those states was upheld. The third, fourth, and fifth paragraphs of the syllabus indicate the subject involved and the holding of the court:

"(3) The ordinance of the organic convention of the commonwealth of Virginia, under which the state of West Virginia was organized, and the act of May 13, 1862, of the said commonwealth, constitute a proposition of the former state that the counties of Jefferson and Berkeley and others might, on certain conditions, become part of the new state; and the provisions of the Constitution of the new state concerning those counties are an acceptance of that proposition.

"(4) The act of Congress admitting the state of West Virginia into the Union at the request of the commonwealth of Virginia, with the provisions for the transfer of these counties in the Constitution of the new state, and in the acts of the Virginia Legislature, is an implied consent to the agreement of those states on that subject.

"(5) The consent required by the Constitution to make valid agreements between the states need not necessarily be by an express assent to every proposition of the agreement. In the present case the assent is an irresistible inference from the legislation of Congress on the subject."

In *Hancock v. Walsh, Commissioner of the General Land Office of Texas*, 3 Woods, 351, Fed. Cas. No. 6,012, the state of Texas sought to evade the terms of the joint resolution of the Congress of the United States for the annexation of Texas which provided that Texas be allowed, as one of the conditions of annexation, to retain the vacant unappropriated lands within her limits, to be applied to the payment of the debts and liabilities of the republic of Texas. The court held it was not within the

power of the state government to refuse to comply with the terms of the compact. In discussing the question under consideration, Mr. Circuit Judge Woods, who delivered the opinion of the court, said:

"Whether it be a treaty or a contract, it is alike within the clause of the Constitution of the United States which forbids a state from impairing the obligation of contracts. *Green v. Biddle,,* 8 Wheat. 1 [5 L. Ed. 547]. If it is to be considered a treaty, it is protected by the second clause of article 6 of the Constitution of the United States, which declares, 'This Constitution and the laws of the United States, shall be the supreme law of the land.' If this is a treaty, the Legislature of Texas can no more repeat or annul it than it can annul or repeal a clause in the Constitution of the United States. If it is to be considered as a contract it is equally beyond the power of the Legislature; for a state is as much forbidden by the Constitution from passing laws to impair the obligation of contracts made by herself as by other parties. By no device that a state can resort to can she escape this constitutional prohibition. It is perfectly clear that she cannot authorize her agents to violate her own contracts by leaving it to their discretion whether they shall violate them or not."

*United States v. Partello* (C. C.) 48 Fed. 670, and *United States v. McBratney,* 104 U. S. 621, 26 L. Ed. 869, illustrate the different situations that arise in matters concerning jurisdiction over Indian reservations situated with a state at the time of statehood, where there is a compact relating to this subject and where there is not. In the Partello case there was a compact, and it was held that the United States courts had jurisdiction over the crime of rape committed by a white man upon a white woman upon an Indian reservation, because the people of the state had full power to relinquish to the United States such jurisdiction, and did so, whilst in the McBratney case the Supreme Court of the United States held that under the act admitting Colorado into the Union the United States had no jurisdiction of the crime of murder committed by one white man upon another on the Ute Reservation, for the reason that the admission act of Colorado, wherein that reservation was situated, "contains

no exception of the Ute Reservation, or of jurisdiction over it," clearly indicating that it would have made a difference in the rule laid down in that case if it had. *Ward v. Race Horse*, 163 U. S. 504, 16 Sup. Ct. 1076, 41 L. Ed. 244, is another case of this class. The majority opinion was prepared by the present Chief Justice, who distinguished that case from the case of the Kansas Indians, *supra*, as follows:

"The first case (that of the Kansas Indians) involved the right of the state to tax the land of Indians owned under patents issued to them in consequnece of treaties made with their respective tribes. The court held that the power of the state to tax was expressly excluded by the Enabling Act. The second case (that of the New York Indians) involved the right of the state to tax land embraced in an Indian reservation, which existed prior to the adoption of the Constitution of the United States. Thus these two cases involved the authority of the state to exert its taxing power on lands embraced within an Indian reservation, that is to say, the authority of the state to extend its powers to lands not within the scope of its jurisdiction, whilst this case involves a question of whether where no reservation exists a state can be stripped by implication and deduction of an essential attribute of its governmental existence. Doubtless the rule that treaties should be so construed as to uphold the sanctity of the public faith ought not to be departed from."

There are other federal cases bearing directly upon the same question, among which may be mentioned *Beecher v. Wetherby*, 95 U. S. 517, 24 L. Ed. 440, which upholds a compact between the United States and the people of the proposed state of Wisconsin, concerning grants of land to the new state; *Cooper v. Roberts*, 18 How. 173, 15 L. Ed. 338, where a similar clause in a compact between the state of Michigan and the United States is upheld; *Boyd v. Nebraska*, 143 U. S. 135, 12 Sup. Ct. 375, 36 L. Ed. 103, a compact between the United States and Nebraska relating to naturalization was sustained; and *State of Minnesota v. Batchelder*, 1 Wall. 109, 17 L. Ed. 551, recognizes the validity of such compacts. The state courts seem to be in harmony with the federal courts on this question. *Hogg v. Zanesville Canal &*

*Mfg. Co.*, 5 Ohio, 410; *Brittle v. People*, 2 Neb. 198; *Romine v. State et al.*, 7 Wash. 215, 34 Pac. 924; *Duke v. Cahawba Nav. Co.*, 10 Ala. 82, 44 Am. Dec. 472.

The foregoing cases illustrate the wide range of subjects which the courts have held to be proper subjects of compact between the states and the states and the United States. If the far greater number and diversity of subjects concerning which the people of proposed states and the United States have deemed it expedient to enter into compacts which are now and for years have been in force unquestioned, and under which the respective sovereignties are working out their common destiny without any apparent consciousness of inequality on that account, could be spread before us within any reasonable space, it would be obvious that Mr. Justice Field did not state the rule too broadly in *Ft. Leavenworth R. Co. v. Lowe, supra,* when he said:

"Though the jurisdiction and authority of the general government are essentially different from that of the state, they are not those of a different country, and the two, the state and the general government, may deal with each other in any way they deem best to carry out the purposes of the Constitution."

Utah furnishes what up to that time was a novel example of such dealing. The Enabling Act of Utah provides that the Constitutional Convention "shall provide by ordinance irrevocable without the consent of the United States and the people of said state, * * * that polygamous or plural marriages are forever prohibited." The ordinance was adopted in accordance with the terms of the Enabling Act as follows:

"The following ordinance shall be irrevocable without the consent of the United States and the people of this state: First. Perfect toleration of religious sentiment is guaranteed. No inhabitant of this state shall ever be molested in person or property on account of his or her mode of religious worship; but polygamous or plural marriages are forever prohibited."

This ordinance has never received judicial interpretation so far as I am aware, but a Senator from that state was tried before the United States Senate for violation of the anti-polygamy law, and

its validity, or that it was to be given the force and effect of a compact, was not even questioned by the eminent lawyers who appeared on either side of that celebrated case.

There is a like provision in our Enabling Act which we ac· cepted. We also agreed not to limit the authority of the United States pertaining to Indians; that perfect toleration of religious sentiment shall be secured; that we will not manufacture, sell, barter, or give away intoxicating liquors in that part of the state formerly known as Indian Territory for a period of 21 years, etc. All of these agreements limit somewhat the legislative power of the state, and of course, if the view of the majority of the court as expressed by Justice Williams is sound, the state may repudiate these solemn compacts without consulting the federal government or the sovereign people of the state. I cannot give my assent to that proposition. It seems to me that the agreement not to move the state capital until 1913 and not to appropriate any public moneys of the state for the erection of buildings for capital purposes during such period, involves the least important subject embaced within the Enabling Act, and if the compact in relation to that cannot be upheld, the power of compact between the federal government and the people of a proposed state is limited indeed, and heretofore has been very little understood by the contracting parties. It is incomparably inferior to the subject of the compact between Virginia and Kentucky upheld in *Green v. Biddle, supra.* Of that subject Mr. Justice Story said:

"Titles to land cannot be acquired or transferred in any other mode than that prescribed by the laws of the territory where it is situate. Every government has, and from the nature of sovereignty must have, the exclusive right of regulating the descent, distribution, and grants of the domain within its own boundaries; and this right must remain until it yields it up by compact or conquest."

The right of sovereign states to enter into compacts with each other is itself one of the highest attributes of sovereignty. The power exists in full vigor in every state which has not parted with this portion of its natural sovereignty. The limitation upon this

Coyle v. Smith *et al.*

great power sanctioned by the majority opinion constitutes to my mind a far greater restriction upon the sovereignty of the state than the exercise by the sovereign people of the proposed state of the power to bind the state, by compact with the United States, not to remove her capital prior to 1913.

The Enabling Act contained propositions only not binding until accepted by the people of the proposed state. The people were free to accept or reject those propositions; indeed Arizona whose admission was provided for by the same Enabling Act did reject some of its proposals and refused statehood on the terms proposed. Oklahoma could and probably would have done the same if the people had not been satisfied with the terms of her Enabling Act. If, after statehood, the state becomes impressed with the idea that the terms imposed by the Enabling Act and accepted by the people in their sovereign capacity impinge so greatly upon her rights as a sovereign state that she cannot longer tolerate them, before she would be permitted to repudiate them, if equitable principles were applied, she would be required to tender back to the United States the boon of statehood, return the $5,000,000 school fund, and the priceless heritage of school and public building lands acquired through the Enabling Act and its acceptance, and restore everything of value which she received by virtue thereof.

Municipalities as well as individauls ought inviolably to observe their compacts and their promises. Vattel says (Laws of Nations, 196) :

"This great truth is generally acknowledged by all nations; the reproach of perfidy is esteemed by sovereigns a most atrocious affront, yet he who does not observe a treaty is certainly perfidious, since he violates his faith."

In this conclusion I am authorized to say Mr. Justice DUNN concurs.